Ronald P. HOXIE,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant,*

*and*

CLATSOP COUNTY ASSESSOR,
*Intervenor-Defendant.*

(TC 4494)

Trial was held January 30, 2001, in Astoria, Oregon.

Michael A. Autio, Astoria, argued the cause for Plaintiff (taxpayer).

Rochelle Nedeau, Assistant Attorney General, Department of Justice, Salem, filed an Answer for Defendant (the department), but did not argue the cause.

Blair J. Henningsgaard, Clatsop County Assistant County Counsel, Astoria, argued the cause for Intervenor-Defendant (the county).

Decision for Plaintiff rendered April 12, 2001.

## CARL N. BYERS, Judge.

Plaintiff (taxpayer) appeals a magistrate determination of the exception value used to increase the maximum assessed value (MAV) of his property for the 1997-98 tax year. Taxpayer claims the improvements made were not the source of the great increase in value between 1995 and 1997. Clatsop County (the county) intervened and defended the assessment. Trial was held January 30, 2001, in Astoria, Oregon.

### FACTS

The parties agree on many of the facts. The subject property consists of an entire city block in downtown Astoria near the county courthouse, improved with two large buildings and a parking lot. The office building located at 800 Exchange Street (800 building) was constructed in 1923. It has four stories of 4,198 square feet per floor plus 2,500 square feet in the basement. The medical clinic building located at 820 Exchange Street (820 building) was constructed in 1978-79 and has two stories with 7,600 square feet per floor.

The property's history is interesting and relevant. In 1954, a group of medical doctors purchased the 800 building plus a parking area. In 1978-79, the doctors acquired the rest of the land in the block and constructed the 820 building at a cost of approximately $1.2 million. In 1989, U.S. Bancorp foreclosed its mortgage for $1,465,000, and the subject property was conveyed to the bank by a deed in lieu of foreclosure.

When the bank took over the property, all of the buildings were vacant. In 1989, the bank leased the second floor of the 800 building to a state agency. In 1993, the bank leased the second floor of the 820 building to a group of doctors. Sometime around 1993, the bank listed the property for sale at $675,000. The county considered buying the property and negotiated a price of $500,000. Taxpayer learned of the availability of the property by a newspaper article indicating that the county had declined to purchase it. Taxpayer purchased the property in June 1994 for $500,000. At that time, the property had an assessed value of $691,360. Based on the

purchase price, taxpayer appealed to the board of equalization, which reduced the assessed value of the property to $500,000 for the 1994-95 tax year. The assessed value was increased for the 1995-96 tax year to $580,000 based on a trending factor of 16 percent.

Taxpayer took possession in September 1994 and immediately began cleaning the property and started a maintenance program. Apparently, there was a significant amount of trash and debris to be removed, and the 800 building was in need of painting and many repairs. In addition, taxpayer engaged an architect that resulted in what taxpayer describes as three creative changes. The changes were: (1) realignment of the lobby area of the first floor in the 820 building, (2) creation of a new entrance in the 800 building to open up the first floor and basement, and (3) installation of a new staircase in the 800 building from the third floor to the fourth floor. Taxpayer made a number of other improvements such as replacing some windows, rewiring the 800 building, leveling the first floor in the 800 building, and installing a new fire-alarm system in the 800 building. Many improvements were effected to make spaces suitable for tenants such as moving walls, changing plumbing and floor covering. Taxpayer testified that he spent $58,664 in improvements from the time of purchase up to July 1, 1995. He stated that he spent $225,265 on improvements between July 1, 1995 and July 1, 1997.

## ISSUE

For purposes of determining the property's MAV for 1997-98, how much value did the post-1995 improvements add?

## ANALYSIS

■    Article XI, section 11, of the Oregon Constitution, adopted in the May 1997 election, establishes a MAV for property taxation. Section 11 specifies that the MAV shall be the 1995 real market value (RMV) reduced by 10 percent. Thereafter, the MAV may increase 3 percent per year. However, the constitution and implementing statutes recognize that there are exceptions to the rule. One specific exception is

for new construction or new improvements to existing property.

Article XI, section 11 has been implemented by statutes. *See* Or Laws 1997, ch 541. ORS 308.153[1] provides the method for computing a new MAV where there are new improvements to property. That statute provides, in relevant part, as follows:

"(1)   If new property is added to the assessment roll or improvements are made to property as of January 1 of the assessment year, the maximum assessed value of the property shall be the sum of:

"(a)   The maximum assessed value determined under ORS 308.146; and

"(b)   The product of the value of the new property or new improvements determined under subsection (2) of this section multiplied by the ratio of the average maximum assessed value over the average real market value for the assessment year.

"(2)   The value of new property or new improvements shall equal the real market value of the new property or new improvements reduced (but not below zero) by the real market value of retirements from the property tax account.

"(3)   The property's assessed value for the year shall equal the lesser of:

"(a)   The property's maximum assessed value; or

"(b)   The property's real market value."[2]

In construing and applying ORS 308.153, it is necessary to consider the definitions contained in ORS 308.149. Specifically, ORS 308.149(5)(a) states, in part:

" 'New property or new improvements' means changes in the value of property as the result of:

---

[1] All references to the Oregon Revised Statutes are to 1997.

[2] Because the constitutional amendment required a change of the assessment date from July 1 to January 1, it was necessary to provide an adjustment for the first year to which the provision applied. Consequently, Oregon Laws 1997, chapter 541, section 12, provides that for the tax year beginning July 1, 1997, the value determined under section 11(2) of the act (ORS 308.153(2)) shall be the real market value as of July 1, 1997, reduced by retirements.

"(A) New construction, reconstruction, major additions, remodeling, renovation or rehabilitation of property[.]"

■ Because new improvements are defined as "changes in value" rather than the improvements themselves, it appears that the legislature intended to measure the increase in RMV of the remodeled property as opposed to the value of the improvements themselves. Consequently, remodeling that cost $15,000 might increase the RMV of the property only $9,000, or it could increase the value $50,000. The statutory test measures the net increase in value as a result of the improvements.

The parties agree that the critical task for the court is to determine how much the RMV increased as a result of the improvements.[3] It is a daunting task. In making the determination, the court must exclude increases in RMV due to cleaning, maintenance and repairs, or minor construction.[4] Likewise, the court cannot consider increases in RMV due to inflation, changes in market demand, or changes in management or use of the property.

Obviously, a myriad of factors can affect the RMV of property. Changes in interest rates, traffic patterns, laws such as the Americans with Disabilities Act, fire and safety codes, technology, costs, asbestos, and many other things can all affect RMV. However, none of those factors constitutes an exception to the MAV. The exception value is limited to the RMV attributable to the new improvements. In this case, those new improvements are the new entrance to the 800 building, the new staircase to the fourth floor of the 800 building, the realigned lobby in the 820 building, and other changes in walls, bathrooms, floors, wiring, alarms, windows, and lights. The new improvements do not include cleaning and painting of the exterior walls and windows. It also does

---

[3] There is no real dispute about the changed property ratio and there is no dispute with regard to the MAV of the property prior to the improvements.

[4] " 'Minor construction' means additions of real property improvements, the real market value of which does not exceed $10,000 in any assessment year or $25,000 for cumulative additions made over five assessment years." ORS 308.149(6); see also OAR 150-308.149-(A).

not include work on the building where there is no significant change in "design or materials." OAR 150-308.149-(A)(2)(b).

The determination of value is made even more difficult by the fact that there was work in progress as of July 1, 1995. Improvements made prior to July 1, 1995, would not be considered "new improvements" under ORS 308.153. Only those improvements made from July 1, 1995 to July 1, 1997, constitute new improvements for purposes of calculating an exception value.

In his testimony, taxpayer acknowledged his good fortune. He spent less than $4,000 realigning the lobby in the 820 building. Nevertheless, by July 1, 1995, he had leased the entire 820 building for a total monthly rent of $14,200. He had also leased part of the first floor and all of the second floor of the 800 building for a total monthly rent of $5,188. Thus, as of July 1, 1995, taxpayer was receiving $232,656 in annual gross rent, with portions of the 800 building yet to be rented. Taxpayer testified that his management policy was not to build out or finish space until after a tenant had signed the lease and that most of the improvements were done to suit the tenants.

By July 1, 1997, taxpayer was receiving a total of $314,234 in annual rent. Taxpayer argues that because he was receiving 74 percent of the relevant rent by July 1, 1995, it is unlikely that an additional 26 percent increase in rent created a million dollar increase in value due to the improvements.

The parties submitted appraisal evidence. When taxpayer sought financing to purchase the property in 1994, the Bank of Astoria had the property appraised. The appraiser was aware of the property's history and offering/listing price of $675,000. That appraiser saw the market as stagnant with no real growth anticipated. He also did not anticipate changes in the property, viewing the "current configuration" of the 800 building as representing the "most economically optimum use of the property at this time." Consequently, that appraiser found an as-is value of $572,500 but a value with stabilized occupancy of $625,000. He viewed the property as a turn-around project with higher-than-market risk.

In 1998, taxpayer applied to the Bank of Astoria for refinancing. The bank again had the property appraised, this time by Jackson Roholt. Roholt opined that the RMV of the property as of March 1998 was $2,050,000. At that point, the property had a potential gross-rental income of $347,244 per year. Roholt saw the property in a more positive light. He indicated that it is located in "the heart of downtown" Astoria and is in a good neighborhood. He estimated that renovations had reduced the effective age of the 800 building to 20 years.

Taxpayer was aware of Roholt's appraisal and asked him to calculate an exception value for purposes of the property tax appeal. Based on reconstructed income, Roholt calculated the RMV of the property as of July 1, 1997, at $1,857,000. He also calculated the RMV of the subject property as of July 1, 1995, at $1,524,000. That resulted in an increase of $333,000 in value attributable to: (1) $225,656[5] in improvements, (2) increased land values, and (3) increased rental values due to inflation. Roholt calculated the increase in rent due to inflation as having a market value of $68,960, leaving $264,040 for the increase in value due to the improvements and increases in land value.

The county also had the property appraised for the purpose of calculating an exception value to the MAV. The county appraiser found a RMV as of July 1, 1997, of $1,904,000, of which she attributed $370,500 to land and $1,533,500 to improvements. She calculated an exception value by first determining the RMV of the improvements for 1995 and trending them forward to July 1, 1997. That is, of the total $580,000 RMV as of July 1, 1995, the appraiser found that the RMV of the improvements was $365,640. She trended that amount forward to July 1, 1997, to arrive at a RMV for the improvements of $449,737. She then deducted that amount from the July 1, 1997, RMV of the improvements to arrive at an exception value of $1,083,763.

The county recognizes that the exception value may not include increases due to market trends. The appraiser

---

[5] Roholt rounded the cost of the improvements to $225,000.

attempted to account for market trends by applying a trending factor to the original RMV of the improvements. However, that approach assumes that all of the remaining increase in value is due to new improvements. The evidence indicates that such is not the case with this property.

It is apparent that taxpayer's leasing of the 820 building and the second floor of the 800 building were not due to new improvements but probably a combination of cleaning and good luck. Those two leases alone significantly increased the income and therefore the value of the property. Moreover, some of the improvements were made prior to July 1, 1995, and would therefore be excluded from consideration.

The assessment history of the subject property is revealing. The total assessed values by year are as follows:

| Year | Assessed Value | Year | Assessed Value |
|------|---------------|------|---------------|
| 1988-89 | $1,340,280 | 1993-94 | $ 691,360 |
| 1989-90 | $1,165,570 | 1994-95 | $ 500,000 |
| 1990-91 | $1,015,800 | 1995-96 | $ 580,000 |
| 1991-92 | $1,015,800 | 1996-97 | $ 713,400 |
| 1992-93 | $ 750,000 | 1997-98 | $1,590,426 |

Based on all the evidence, the court is persuaded that the decline in market value from $1,340,280 in 1988 to $500,000 in 1994-95 was primarily a result of market demand, rather than deterioration in the property. Likewise, the rapid increase in value from 1995 to 1997 was due in large part to changes in market demand. Although the county appraiser applied a trending factor, it must be remembered that such factors are generalized from sales data. A specific property may increase in value either at a greater or lesser rate due to its unique characteristics and circumstances.

Roholt calculated an increase in RMV between July 1, 1995 and July 1, 1997, of $333,000. Because some of the rents in 1995 were higher than those in 1997, Roholt probably overestimated the 1995 RMV. However, it does not appear that it would have been excessive by more than $50,000-$60,000. Roholt also calculated a capitalized value of the increase in rents after July 1, 1997, at $68,960.

Concluding that the increase in rents largely offsets the excessive rents estimated for the 1995 value, Roholt's income approach indicates an increase in RMV of approximately $330,000. The cost approach would indicate something more than the $225,656 invested because the value of taxpayer's labor is not included in those out-of-pocket costs. Because taxpayer's labor included management, supervision of cleaning, and other items not includible in new improvements, it is impossible to estimate the value of that factor.

Based on the above analysis, the court finds that the increase in RMV was $330,000. That increase in RMV must be multiplied by the changed property ratio of .73, resulting in an exception value of $240,900. The court finds that $240,900 should be added to the original MAV of the improvements of $329,076 for a total improvement MAV of $569,976. When added to the MAV of the land of $192,924, the court arrives at a July 1, 1997, MAV for the subject property of $762,900. Judgment will be entered consistent with this Opinion. Plaintiff to recover his costs and disbursements.