I. INTRODUCTION
This case comes before the court for decision after trial. Plaintiff (taxpayer) appeals from a Magistrate Decision finding that, for the 2003-04 tax year, the real market value (RMV) of certain residential property owned by taxpayer was $933,000 and the maximum assessed value (MAV) and assessed value (AV) of the property was $893,630. Taxpayer maintains that the actual RMV of the property was not more than $700,000, and, alternatively, that the AV of the property should not have exceeded $800,600. Defendant (the department) and Intervenor (the county) ask the court to find that the RMV of the property was $1,200,000, or, alternatively, that the MAV and AV of the property was $1,093,610.[1] *Page 53 
 II. FACTS
Taxpayer purchased certain residential property in Washington County in June 2000 for $452,500. Soon thereafter, taxpayer began improving the landscaping and remodeling the single-family residence located on the property (together, the remodel). The remodel can be described as follows: taxpayer gutted and rebuilt over half the home; added approximately 1,000 square feet to its size; and significantly updated, remodeled, and refurbished the rest of the home and the landscaping. By January 1, 2002, taxpayer had completed about half of that work. The county, as of that date, for purposes of collecting property taxes for tax year 2002-03, determined that the RMV of taxpayer's property was $839,270 (of which $187,850 was for the land and $651,420 for the improvements), and that the MAV and AV was $777,240. By January 1, 2003, taxpayer had completed almost all of the remodeling work. The county, as of that date, for purposes of collecting property taxes for tax year 2003-04, determined that the RMV of taxpayer's property was $1,224,710 (of which $192,780 was for the land and $1,031,930 for the improvements), and that the MAV and AV was $1,112,120. The county derived the figures for the 2003-04 tax year using an exception value (EV) of $415,980 and a changed property ratio (CPR) of 0.749.
Taxpayer appealed the county's assessment for tax year 2003-04 to the county Board of Property Tax Appeals (BOPTA), which found taxpayer's property to have an RMV of $933,000 (of which $192,780 was for the land and $740,220 was for the improvements), an EV of $124,270, and an MAV and AV of $893,630. Taxpayer appealed that decision to the Magistrate Division of this court, which left the BOPTA values undisturbed. This appeal ensued.
 III. ISSUE
What are RMV and MAV of taxpayer's property for tax year 2003-04?
 IV. ANALYSIS
In Oregon, real property is taxed on the lesser of the property's MAV or RMV. ORS 308.146(2); ORS 308.153(3).[2] *Page 54 
The MAV is normally the greater of the property's MAV from the prior year or 103% of the property's AV from the prior year. ORS308.146(1). However, for new property and new improvements to property, the MAV is calculated differently. ORS 308.146(3)(a). With new improvements to property, such as is involved in the remodel at issue in this case, see ORS 308.149(5)(a)(A) (including "remodeling" in the definition of "new property or new improvements"); OAR 150-308.149-(A)(1)(d)[3] (defining "remodeling" as "a type of renovation that changes the basic plan, form or style of the property"), the MAV is the sum of the MAV as derived under ORS 308.146 (the MAV of the property as if it had not changed) and the MAV of the new improvements. ORS308.153(1). The MAV of the new improvements is the product of the EV and the CPR. ORS 308.153(1)(b). The EV is the amount by which the RMV of the new improvements exceeds the RMV of any retirements. ORS 308.153(2)(a). The CPR is the ratio of the average MAV for similar property in the area to the average RMV for similar property in the area. ORS 308.153(1)(b); ORS 308.149
(defining terms used in ORS 308.153(1)(b)).[4]
The values of several of the above-mentioned factors are undisputed in this case. The MAV and AV of the property for tax year 2002-03 was $777,240. Accordingly, the MAV of the property for tax year 2003-04, is the greater of the prior year's MAV ($777,240) or 103% of the prior year's AV ($800,557) as calculated under ORS 308.146, which is $800,557. Additionally, it is undisputed that the CPR relevant to this case is 0.749. What remains in dispute are the values of the two remaining factors that determine the MAV and, ultimately, the AV of taxpayer's property for tax year 2003-04: the EV and RMV of taxpayer's property for that year.
1, 2. RMV is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length *Page 55 
transaction occurring as of the assessment date for the tax year." ORS 308.205(1). See Chart Development Corp. v. Dept. ofRev., 16 OTR 9, 11-13 (2001) (discussing the concept of RMV). There are three traditional methods used to calculate RMV: the cost approach, the income capitalization or income approach, and the sales comparison approach, also known as the sales or market approach. Allen v. Dept. of Rev., 17 OTR 248, 252 (2003); seealso OAR 150-308.205-(A)(2) (stating that all three methods must be considered in determining a property's RMV even if all cannot be applied). Neither taxpayer nor the county found the income approach appropriate for taxpayer's property, and neither does the court, because taxpayer's property is not used to generate income. See Appraisal Institute, The Appraisal of Real Estate
62 (12th ed 2001) (stating that the income approach is "not often used in the valuation of single-family homes"). The dispute, therefore, centers on the cost and sales comparison approaches.
A. The Cost Approach
"In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." Appraisal Institute, The Appraisalof Real Estate 63. The cost approach is "particularly useful in valuing new or nearly new improvements," id., and taxpayer accordingly places great reliance on it. However, the cost approach is less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable. The county argues that such is the case here and that, therefore, the cost approach is inappropriate for taxpayer's property.
Taxpayer presented extensive evidence at trial showing the costs she incurred remodeling her property, including financial records prepared by her business partner, Bruce Deschner, who supervised and worked on the remodel. Based on those records, taxpayer testified that she spent $346,000 on the remodel. That figure was kept low, she testified, because she did much work herself, sought out *Page 56 
bargains on materials, avoided expensive materials, and refurbished many materials that were already in the home. For instance, taxpayer testified that she bought many plants at bargain basement prices at an auction and that she avoided expensive hardwood flooring in favor of Pergo. Taxpayer argues that, given her evidence, and because the construction is new, the cost approach should be accorded great weight in valuing her property.
The reliability of taxpayer's evidence is placed in some doubt, however, by the testimony of Deschner, who stated that the $346,000 figure was low by approximately $10,000 to $15,000 because he had failed to account for some costs related to flooring, roofing, and other aspects of the remodel. Similarly, as the county pointed out, some expensive items, such as certain decking materials, appeared to be missing from taxpayer's cost estimate. On the other hand, Deschner also testified that the cost estimate was somewhat high in that it included some items of personal property, such as a $4,500 refrigerator. Taxpayer's cost estimate was further undermined by taxpayer's appraiser, Steven Gentzkow. In his appraisal, Gentzkow valued taxpayer's property under the cost approach at $771,233, of which $175,000 was for the land, $65,000 for the "as-is value of site improvements," $737,984 for the reproduction cost of the improvements, and $206,751 for depreciation.[5]
The county argues that, in addition to those discrepancies, taxpayer's cost estimate is unsound for a more fundamental reason: taxpayer did not pay market price for the remodel. To understand the county's argument, it is necessary to give some background information on the relationship between taxpayer and Deschner. Taxpayer and Deschner were business partners for many years in a company called Magno Pacific Construction (MPC).[6] Taxpayer owned 52% of *Page 57 
the company as President and Deschner owned 48% as Vice-President.[7] Deschner did most of the work for MPC, from bidding on projects to managing money, while taxpayer participated in general management. MPC had only a small handful of permanent employees but as many as 80 temporary employees when it worked on large projects. The company was primarily engaged in the business of working on government construction projects, although it did work on two residential projects, an area in which Deschner had much experience.
Most of the work on taxpayer's remodel was performed by her, Deschner, and MPC employees, although electrical work, plumbing, flooring, roofing, and some other work was done by outside companies. Taxpayer paid contractor rates for materials, which are generally lower than retail rates.[8] Additionally, as the county points out, taxpayer paid less than market rate for labor costs because she was able to cut out the profit element on work performed by MPC employees. Although the testimony was confusing and uncertain on this point, it appears that taxpayer only paid MPC $9,500 to $10,000 for work its employees did on the remodel, even though as many as eight employees worked on the multi-year project. Deschner calculated total labor costs at $89,000, of which he received $25,000 to $35,000 in compensation for his services, with some of that coming from MPC, some from taxpayer herself, and some from another company, Magno Humphries, of which taxpayer is President and sole owner and Deschner is a building supervisor.[9] Taxpayer testified that she did not know which portions of Deschner's compensation for the remodel came from which of her companies and which came from her personally. Deschner testified that it was hard to make an accurate cost estimate given *Page 58 
that taxpayer paid the bills for the remodel from several accounts and that some of the money went to him personally and some to MPC and outside contractors.[10] The confusion and uncertainty regarding labor costs was exaggerated by the lack of any budget for the remodel or a contract between taxpayer and either Deschner or MPC, which might have specified costs for labor and materials, how payments would be made, etc.
3. The court concludes that taxpayer's ultimate cost estimate is uncertain and unreliable given the necessary adjustments mentioned at trial, the discrepancy between taxpayer's figure and Gentzkow's figure, the incomplete and confusing nature of the evidence and testimony regarding how the remodel was paid for and by whom, and the close relationship between taxpayer and those who did the work, both in terms of the contractor discounts that taxpayer's company, MPC, received for materials, and in terms of the uncertain rates which taxpayer and MPC paid for labor. Accordingly, the court concludes that the cost approach is not an appropriate method to use in valuing taxpayer's property. The court therefore turns to sales comparison approach.
B. The Sales Comparison Approach
1. Real Market Value
4. Under the sales comparison approach, the value of a property is derived by "comparing the subject property with similar properties, called comparable sales." Appraisal Institute, TheAppraisal of Real Estate 63 (emphasis omitted). That comparison is based on many factors, and adjustments are made for any differences between the comparable sales and the subject property so that the appraiser can derive a value for the subject property. Id. at 63-64. "The sales comparison approach is most useful when a number of similar properties have recently been sold or are currently for sale in *Page 59 
the subject property's market." Id. at 63. Both parties agree that the sales comparison approach is helpful in determining the RMV of taxpayer's property; the court concurs.
Taxpayer's property is located in the Montclair neighborhood, which Gentzkow described as an established, exclusive residential development with good market appeal due to its location and lack of adverse conditions, as well as its large, quality, well-maintained homes. According to Gentzkow, taxpayer's property comprises more than 22,000 square feet, with extensive landscaping. After the remodel, the home comprised nearly 8,000 square feet with 14 rooms, including 5 bedrooms and 4.2 bathrooms. Much of the house was gutted and rebuilt, while the rest was updated, remodeled, and refurbished: the end product was custom built, high quality, and new. In addition, there was a three-car garage, a large, custom, and high-quality rear deck and patio, and an additional unit described by taxpayer as a gazebo and by the county as an entertainment pavilion, which contained a living room, bedroom, bathroom, and kitchen. The home was equipped with Pergo, carpet, and marble floors, new fixtures and electrical service, a new roof, new siding and windows, and a new driveway. The kitchen had a full line of high-quality, built-in appliances, granite counter tops, custom cabinetry, and skylights. As of January 1, 2003, some of the work on the patio remained unfinished, with some fountains and retaining walls yet to be installed and landscaping work still to do. Although most of the homes in Montclair were built in the 1960's and 1970's, Gentzkow described taxpayer's remodeled residence as having an effective age of only five years.
Gentzkow testified that the remodel rendered taxpayer's property uncharacteristic for the neighborhood and thus adversely impacted its marketability. Gentzkow also felt that marketability was adversely impacted by taxpayer's unique choices in custom features, such as bright red kitchen cabinets, and by the low quality of some features, such as the Pergo flooring, which Gentzkow described as out of place in a home the size of taxpayer's. Finally, Gentzkow stated that the size of taxpayer's home was itself a negative factor because, in a neighborhood of 3,500 to 5,000 square foot *Page 60 
homes, taxpayer's home was over-improved, rendering the excess space functionally obsolete.[11]
Gentzkow used three comparable sales in his appraisal of taxpayer's property. All three comparable sales are located in Montclair. Comparable G1 sold in November 2003 for $765,000; it is similar to taxpayer's property in lot size, landscaping, and the home's effective age, quality, and amenities;[12]
however, the home is smaller: Gentzkow adjusted Comparable G1 upward $54,000 to equate it with taxpayer's property, concluding that it indicated a value for taxpayer's property of $819,000. Comparable G2 sold in December 2003 for $682,000; its home is similar in effective age and quality; however, its lot is smaller, its landscaping inferior, and the home smaller with inferior amenities: Gentzkow adjusted it upward $84,300 for a value of $766,300. Comparable G3 sold in May 2003 for $559,100; it is similar in landscaping and home quality; however, its lot is smaller, and the home has an older effective age and is smaller with inferior amenities: Gentzkow adjusted it upward $148,075 for a value of $707,175. Weighing the values of the three adjusted comparable sales and comparing them to taxpayer's property, Gentzkow valued taxpayer's property at $750,000.
The county's appraiser, Barbara Miller, used four comparable sales in her appraisal of taxpayer's property. Comparable M2 is located in Montclair, but the other three are located in a relatively similar neighborhood across the *Page 61 
highway that abuts Montclair and has generally larger homes. Comparable M1 sold in October 2002 for $1,100,000; its home is similar in effective age and quality; however, its lot is larger, its landscaping inferior, and its home is smaller with inferior amenities: Miller adjusted it upward $181,200 for a value of $1,281,200. Comparable M2 sold in January 2002 for $995,000; its home is similar in effective age; however, its lot is larger, its landscaping inferior, and its home superior in quality but inferior in size and amenities: Miller adjusted it upward $227,980 for a value of $1,222,980. Comparable M3 sold in July 2003 for $867,500; its lot is much larger, its landscaping inferior, and its home inferior in size and amenities, and much inferior in effective age and quality: Miller adjusted it upward $204,650 for a value of $1,072,150. Comparable M4 sold in January 2002 for $810,000; its home is similar in effective age and amenities; however, its lot is larger, its landscaping much inferior, and its home much inferior in quality and size: Miller adjusted it upward $242,840 for a value of $1,052,840. Weighing the values of the four adjusted comparable sales and comparing them to taxpayer's property, Miller valued taxpayer's property at $1,200,000.
At trial, Gentzkow criticized Miller's appraisal on several grounds. He contended that Miller was ill-trained and inexperienced, that she made several mistakes, and that her numbers were misleading insofar as they were accurate. Gentzkow testified that Miller failed to make necessary adjustments for things such as functional obsolescence and the unique nature of taxpayer's property. Gentzkow stated that the nearby neighborhood in which most of Miller's comparable sales were located was nicer and contained larger, estate style homes. Gentzkow also noted that two of Miller's comparable sales sold for less their original asking prices (which were close to values Miller placed on them). Additionally, Gentzkow questioned how comparable Miller's comparable sales were, given that she made as many adjustments as she did; indeed, Gentzkow testified that Miller made so many adjustments so as to render her appraisal in violation of accepted professional appraisal standards. To support his own valuation, Gentzkow pointed to a May 2002 appraisal he had done on taxpayer's property for insurance purposes; at *Page 62 
that time, he valued the property at $700,000. Gentzkow also pointed to another insurance appraisal by another appraiser in July 2004; that appraisal valued the property at $710,000.
On the other hand, Miller found several faults in Gentzkow's appraisal. She testified that she conducted in-depth visits of each of her comparable sales and that she spoke with the owners; she also testified that she did the same for Gentzkow's comparable sales. In contrast, Gentzkow admitted that he had only taken pictures of his comparable sales. Miller stated that Gentzkow failed to adjust his comparable sales properly, given their low quality and the fact that they were each remodeled, some significantly, immediately after their sales. Miller also pointed out that Gentzkow, too, had used comparable sales from nearby neighborhoods in his May 2002 appraisal of taxpayer's property. Additionally, the court notes that BOPTA considered Comparable G2 when it valued taxpayer's property, concluding that Comparable G2 indicated a value for taxpayer's property of $987,000, substantially higher than the value Gentzkow reached. Other factors also weigh against Gentzkow's appraisal and in favor of Miller's. For instance, Deschner at one time told an agent of the county that the RMV of taxpayer's property was around $1,200,000. Finally, it is questionable why, if taxpayer's appraisers indicated values for the property between $700,000 and $750,000, land included, she insures her home alone for $780,000 (the land being valued by all parties and appraisers at just shy of $200,000).
The court finds that neither Gentzkow's nor Miller's appraisals were fully reliable or persuasive, although each provides much useful and reliable information. In the end, as is to be expected, Gentzkow appears to have chosen comparable sales that reflect a lower RMV for taxpayer's property than is appropriate, and Miller appears to have chosen comparable sales that reflect a higher RMV than is appropriate Weighing all the testimony and evidence presented, especially the comparable sales proffered by both parties, the court determines that an RMV of $950,000 is proper for taxpayer's property.
2. Exception Value
5, 6. The question that remains is the EV of taxpayer's property. As stated above, the EV of a property is the amount *Page 63 
by which the RMV of the new improvements to it exceeds the RMV of any retirements. ORS 308.153(2)(a). In making that determination, care must be taken to ensure that only allowable improvements are included. Those improvements are defined as "changes in the value of property as a result of" various activities listed in ORS308.149(5)(a), in this case, remodeling. ORS 308.149(5)(a)(A); OAR 150-308.149-(A)(1)(d). Other improvements are not to be included in the calculation of EV; those include general ongoing maintenance and repair, and minor construction. ORS308.149(5)(b); see also ORS 308.149(6) (defining "minor construction" as "additions of real property improvements, the [RMV] of which does not exceed $10,000 in any assessment year");Hoxie v. Dept. of Rev., 15 OTR 322, 326 (2001) (stating that things such as cleaning and painting cannot be included in the EV). Moreover, the calculation of EV must also exclude factors such as changes in inflation, market demand, and construction codes. Hoxie, 15 OTR at 326. The court will refer to those improvements that must be included in the calculation of EV as new improvements. All other factors, which cannot be included in the calculation of EV, will be termed either minor or routine improvements, or market trends.
Taxpayer argues that, in order to properly account for the distinction between new improvements, on the one hand, and minor or routine improvements and market trends on the other hand, the remodel must be broken down into its component parts. Under that theory, the painting and cleaning done by taxpayer would not count toward the EV of her property, nor would those changes that constitute merely minor construction. There are two ways that taxpayer's theory could apply in practice. One the one hand, the court could look at the entire remodel and ask which aspects of it were minor or involved routine cleaning or maintenance, excluding those from the calculation of EV, and which aspects were substantial enough to constitute new improvements, including those in the calculation. On the other hand, the court could view the remodel as a series of several smaller projects, some of which involved new improvements and some of which did not. Taxpayer asserts that there were approximately 30 such projects.
7. In Hoxie, the court described the work done by the taxpayer as comprising five projects: a new entry; a new *Page 64 
staircase; a new lobby; various changes involving wiring, plumbing, and the like; and the "cleaning and painting of the exterior walls and windows." Id. at 326. The court counted the first four projects towards the taxpayer's EV, but excluded the cleaning and painting. Id. Hoxie is not comparable to the present case. In that case, there were a handful of discrete, easily distinguished projects, such that the minor and routine improvements could be segregated from the new improvements. Here, taxpayer effectively rebuilt half of her home, created a large new addition, and significantly updated the rest of the home and the landscaping as well all as part of one comprehensive project. Although the work undoubtedly could be broken down into several small steps, such an approach would not accurately reflect the nature of the work done on taxpayer's property, and would lead to a distorted conception of EV. There was nothing minor or routine about taxpayer's remodel.
Another point of contention between the parties concerns the concept of retirements. ORS 308.153(2)(a) requires that the RMV of the retirements involved in taxpayer's remodel be subtracted from the RMV of the additions to determine the ultimate value of new improvements that is the EV. Retired property is property that is "voluntarily retired or removed from service or use by the owner." Chart Development Corp. v. Dept. of Rev.,17 OTR 170, 175 (2003). The parties differ on how to value the retirements from taxpayer's property.
Taxpayer argues that retirements should be valued based on the RMV of taxpayer's property, using the following calculations. Beginning with the $450,000[13] that taxpayer paid for the property in June 2000, she would estimate that, at that time, the RMV of the land was $150,000 and the RMV of the improvements was $300,000. Taxpayer then contends that, because approximately 75% of the home was retired during the remodel, the value of the retirements for the entire remodel was 75% of $300,000, or $225,000. Taxpayer would then apply approximately half of that figure to tax year 2003-04, because approximately half of the remodel *Page 65 
work was done between January 1, 2002 and January 1, 2003.
The county, on the other hand, would value retirements based on their salvage value, the value taxpayer could obtain for them on the market. See ORS 308.153(2)(a) (inquiring into the "real market value of retirements from the property tax account"); ORS308.205(1) (defining "[r]eal market value" as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year"); Appraisal Institute, The Dictionary of Real EstateAppraisal 256 (4th ed 2002) (defining "salvage value" as "[t]he price expected for [property] that is removed from the premises usually for use elsewhere"). Because, as Deschner testified, taxpayer either reused all of the old materials, such that they were not actually retired, or threw them away as garbage, such that they were not sold, the county argues that the value of taxpayer's retirements is zero. Indeed, as the county points out, that taxpayer did not sell any of the materials she removed from her property indicates that she did not find anyone willing to buy them.
The court begins by noting the difficulty with calculating a value for retirements in the residential property context. The concept is usually employed with regard to industrial property such as machinery and equipment. See Astoria Plywood Corp v.Dept. of Rev., 6 OTR 40, 46 (1975) (calculating retirements for industrial machinery and equipment); OAR 150-308.205-(D)(5)(b) (requiring reports of retirements as basic appraisal information for the assessment of industrial property). Even as applied to residential property, the concept would be more workable if the case involved a distinct physical unit, such as a detached garage or woodshed, that was demolished or otherwise retired. In such a situation, the RMV of the unit could be approximated, and that value could be subtracted from the RMV of any new improvements to the property as a whole. Here, however, much of the property that was retired is now part of the property that has become new improvements. It is more difficult to place a value on 75% of taxpayer's home and grounds than merely to take 75% of the RMV of the improvements pre-remodel, as *Page 66 
taxpayer suggests. For instance, some portions of the improvements are more valuable than others. Additionally, it may be difficult to assess the RMV of just a retired kitchen or bedroom without taking into account the value of other, integrated improvements. In this case, the difficulty is compounded by the amount of property that taxpayer either refurbished or converted to different uses within the house or on the property.
8. Ultimately, taxpayer bears the burden of proof in this case. ORS 305.427. That includes the burden of proving the extent and RMV of any retirements. Taxpayer has not provided such proof either in the form of an appraisal of those portions of her property that she claims as retirements, or evidence that she sold any materials once they left her property, or that she had obtained goods or services in kind, or any other form. Regardless of how retirements are valued, taxpayer has failed to prove any amount of retirements in this case. Because there is no evidence in the record of the value of taxpayer's retirements, the court cannot find that they have any value.[14]
Viewing taxpayer's remodel as one project without any minor or routine improvements or retirements, it is nonetheless important to include in the calculation of EV only those changes that occurred between January 1, 2002 and January 1, 2003. Hoxie,15 OTR at 327. As stated earlier, taxpayer had completed approximately half of the remodel by January 1, 2002, and the remodel was almost finished by January 1, 2003. The RMV for the 2002-03 tax year was $839,270 and the EV was $340,510. Because the court has found that the RMV of taxpayer's property for the 2003-04 tax year is $950,000, the increase in RMV between January 1, 2002 and January 1, 2003, was only $110,730. Part of that increase in RMV is due not to taxpayer's remodel, but rather *Page 67 
to changes in interest rates, demand, and other market factors that cannot be included in the calculation of EV. Gentzkow's appraisal report states that general market appreciation in the area of taxpayer's property was 4.5% in 2003.[15] The court finds that Gentzkow's figure accurately represents the change in value of taxpayer's property that was not due to the remodel, but rather to market trends, and that, therefore, cannot be included in the calculation of EV.
There are two ways to account for the 4.5% market appreciation. One method is to first increase the 2002-03 RMV of taxpayer's property by 4.5%. That calculation shows what the RMV of taxpayer's property for tax year 2003-04 would likely be without any improvements. Here, $839,270 multiplied by 1.045 is $877,037. The difference between that value and $950,000, the ultimate RMV of taxpayer's property with the improvements, is $72,963, which must, therefore, be the RMV of the new improvements, or the EV of taxpayer's property. The second method is to subtract from the total increase in RMV between tax years 2002-03 and 2003-04 ($110,730) an amount equal to 4.5% of the 2002-03 RMV, $839,270. $110,730 minus $37,767 is $72,963, the same value as derived under the first method. Accordingly, the court finds that an EV of $72,963 is proper for taxpayer's property for tax year 2003-04.[16]
 V. CONCLUSION
After carefully evaluating all of the evidence and testimony presented, the court concludes that the RMV of the subject property for tax year 2003-04 is $950,000 and the EV is $72,963. To determine the MAV for taxpayer's property, the EV must be multiplied by the CPR (0.749), resulting in an MAV for new improvements of $54,649, which must then be added to the MAV as derived under ORS 308.146 (here, $800,557). ORS 308.153(1). That calculation results in an MAV for taxpayer's property of $855,206. Because the AV is *Page 68 
the lesser of the MAV or RMV, ORS 308.153(3), and here the MAV is less than the RMV, the AV for taxpayer's property for tax year 2003-04 is $855,206. The county shall correct the assessment and tax rolls to reflect the above-stated values for taxpayer's property, with any refund due to be promptly paid with statutory interest pursuant to ORS 311.806 and ORS 311.812.
[1] Because the department tendered the majority of the trial to the county, and because both the department and county made the same arguments, the court refers to the arguments of both as those of the county.
[2] All references to the Oregon Revised Statutes (ORS) are to the 2001 edition.
[3] All references to the Oregon Administrative Rules (OAR) are to the current edition.
[4] In 2001, the legislature amended ORS 308.153(1)(b) to state that the CPR cannot exceed 1.00. Or Laws 2001, ch 509, § 9.
[5] Although Gentzkow ultimately found the market approach the strongest indication of value, his final conclusion of value drew support from the cost approach.
[6] Although taxpayer testified that the company was founded in approximately 1997 and closed in 2002, Deschner testified that it was founded in 1990 and closed in June 2003. The court finds that Deschner's testimony was generally more reliable than taxpayer's with regard to financial and business matters.
[7] Those facts are derived from the testimony of Deschner. Taxpayer testified that she did not know how many shares of the company she and Deschner each owned, and that he was President and she was Vice-President.
[8] Although taxpayer testified that she did not know if she paid contractor rates, stating that instead she might have gotten some volume discounts on retail prices, the weight of her testimony and that of Deschner indicates that she paid contractor prices.
[9] Magno Humphries is a vitamin company that leases land from Magno LLC, another company solely owned by taxpayer.
[10] Deschner testified that he was paid as an employee of MPC until June 2002, and then by taxpayer personally until March 2003, from which point on he has been paid as an employee of Magno Humphries. Deschner did not know how many hours he worked on the remodel, although he stated that he sometimes worked 10-12 hours per day on it. As an employee of MPC, he was paid $2,200 every two weeks, and other MPC employees were paid $8 per hour.
[11] Functional obsolescence, a form of depreciation, "is caused by a flaw in the structure, materials, or design of the improvement when compared with the highest and best use and most cost-effective functional design requirements at the time of appraisal." Appraisal Institute, The Appraisal of Real Estate
403. The functional obsolescence at issue in this case, excessive square footage, is known as "superadequacy, which means that some aspect of the subject property exceeds market norms." Id. "It represents a cost without any corresponding increment in value or a cost that the increment in value does not meet." Id. at 404. Most superadequacies are difficult to cure, and they often incur additional expense such as higher heating costs. Id. at 411. Accordingly, they do not add to the value of a property, but usually detract from it. Id. at 411-12. Although functional obsolescence is generally considered in the cost approach, the concept has application in the sales approach insofar as the appraiser must make adjustments in value when comparing the subject property with comparable sales.
[12] By amenities, the court means the size of the garage and the number of bedrooms, bathrooms, and fireplaces, etc.
[13] Taxpayer rounded the actual sale price of $452,500 to $450,000 for purposes of this argument.
[14] Accordingly, it is not necessary to decide whether taxpayer's or the county's method of valuing retirements is correct. The court notes, however, that the county's approach seems inconsistent with ORS 308.153(2)(a), which appears to focus on a value already reflected in the account that is then removed or destroyed. See also ORS 308.205(1) (defining RMV as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of theassessment date for the tax year") (emphasis added).
[15] That figure includes any appreciation in the value of the land that, along with the house, comprises taxpayer's property.
[16] Miller calculated an EV of $391,270. That figure is too large, both because Miller overvalued the RMV of taxpayer's property and because the RMV of new improvements cannot exceed $110,730, the amount of the increase in the RMV of taxpayer's property between January 1, 2002 and January 1, 2003. *Page 69