DECISION
This is a value appeal involving an omitted property assessment covering tax years 2003-04 through 2008-09. The parties focused on the value of the property for the 2008-09 tax year. Trial was held by telephone August 13, 2010. Plaintiff was represented by David E. Carmichael, attorney-at-law, Eugene. Defendant was represented by Marc Kardell, Assistant County Counsel for Lane County. Testifying for Plaintiff were Craig McKern (McKern), Oregon certified residential appraiser; Edward J. Leslie (Leslie), realtor; and Plaintiff Ray Robinson (Robinson). Testifying for Defendant were Connie Chapman (Chapman), department manager and appraisal supervisor; Sarah Madsen (Madsen), lead residential appraiser; and Bryce Krehbiel, residential appraiser. All of Defendant's expert witnesses are employed by Defendant.
 I. STATEMENT OF FACTS
The subject property includes a newer two bedroom, two bath home near Deadwood, Oregon, a rural area of Lane County some 60 miles from the city of Eugene to the east and 40 miles from the coastal town of Florence to the west. Deadwood is a very small town with limited amenities consisting primarily of a post office, a grocery market, and a gas station. Plaintiffs property is on a small dead-end road that ends just past his home. The town of Deadwood is approximately 15 miles away, and, according to Plaintiffs testimony, it takes *Page 2 
about 15 minutes to drive from his house to the post office. The nearest major roadway is State Highway 36, which runs East/West from Eugene to Florence, Oregon. Plaintiffs property is north of that highway. Travel time from Plaintiffs home to Eugene is approximately one and one-half hours and approximately 40 minutes to Florence.
The home is a two-story structure with a gabled enamel steel roof, batten board siding, and a 1,224 square foot basement.[1]
(Def s Ex A at 2; Ptf s Ex 1 at 13, 14.) The parties disagree as to the size of the home. According to Plaintiffs appraiser McKern, the home has 1,957 square feet of gross living area. (Ptf s Ex 1 at 13, 14.) According to Defendant's records, the home has 1,812 square feet of finished living space, plus the 1,224 square foot basement. (Def s Ex A at 2; Ex L.) The home is situated on slightly more than 39 acres of nicely landscape property abutting federal forestland.[2] (Ptf s Ex 1 at 13, 14.)
There are eight or nine outbuildings on the property, all but two of which were added in the year 2000 or before. (Def s Ex A at 4.) The outbuildings include a large, 1,280 square foot renovated barn with an attached utility shed approximately 1,000 square feet, and two hay cover storage areas, one nearly 900 square feet in size. (Def s Ex A at 4.)
There are several bodies of water on the property, including "Lake Kathleen," a seasonal 6 foot deep "frog bog," and a seasonal "orchard pond." (Def s Ex T at 5, 9, and 14.[3]) According to Plaintiff, there are "three waterfalls along [the] driveway during the winter months." (Id at 15.) The property also has a river running through it that sports salmon and other waterlife. Plaintiff was told by the Oregon Fish and Game Department that the stream is "one of the *Page 3 
healthiest cutthroat trout streams in the state." (Id. at 19.) The property is home to a great deal of wildlife, including elk, bobcats, black bears and cougars, various birds, including the rare and protected spotted owl, woodchucks and crawdads, and King Salmon in the creek. (Id. at 17 through 23.)
The property also sports a small 28 passenger hobby railroad with one mile of track. The railroad is described as "18 gauge track," which Plaintiff testified meant that the tracks are 18 inches apart and allows for passenger cars wide enough for two adults to sit side-by-side. Plaintiff has three passenger cars for the railroad and can hold up to 28 people. He also has two "flatcars." The railroad includes a concrete tunnel and a bridge traversing the creek.
Plaintiff purchased the property in 1995 for an undisclosed amount of money. Plaintiff testified that the property had been for sale by "word of mouth" for "about 10 years," for an asking price of $140,000. Plaintiff testified that the property was then listed by a realtor for $125,000 and was only on the market for two days. Plaintiff was presumably the buyer at $125,000, although there is no direct evidence of that. According to Plaintiff, when he purchased the property, there was "junk everywhere." Plaintiff made considerable changes to the property after his purchase.
At the time of Plaintiff's purchase, the property had an old home that was built around the turn of the 20th century.[4] After acquiring the property, Plaintiff tore down the old farmhouse and replaced it with a new home similar in size and appearance to the original farmhouse. Plaintiff testified that the replacement of the home included a new concrete foundation. The home has three covered decks, including a large deck at the rear of the house that affords a view of the river. (Ptf's Ex 1 at 7.) Attached to the house is a four bay, covered carport. On the lower *Page 4 
basement level of the house, there is a 1,200 square foot garage/shop. Plaintiff also remodeled the main barn, added or renovated approximately six other outbuildings, and built the railroad.
Additionally, Plaintiff planted hundreds of trees and shrubs and added approximately 100,000 pounds of rock to preserve the creek for spawning salmon. Plaintiff did not obtain permits for any of the work done after buying the property, including the demolition of the old home and construction of the new one, the renovation of the barn, the construction of the railroad, and the rock added to the creek.
The evidence of the cost of all the work is somewhat vague and confusing. Plaintiff testified on direct examination that he rebuilt the original house at a cost of "considerably less than $300,000," excluding labor. Krehbiel testified for Defendant that part of his assignment in this case was to value the railroad. Plaintiff told him that there was roughly $200,000 into that project. There is no independent documentary evidence as to cost. At the time of trial, Plaintiff had the railroad listed for sale at a price of $120,000 if the buyer removed the track and $135,000 if Plaintiff did the work. (Def's Ex S.)
The real market value (RMV) on the assessment and tax rolls for the 2008-09 tax year, following the omitted property assessment, is $608,420, with $250,260 allocated to the land and $358,160 to the improvements. (Ptf's Compl at 5.) The omit assessment added $414,718 to the RMV. (Id.) The assessed value (AV) was increased from $29,281 to $304,234. (Id.) The RMV for tax year 2003-04 is $386,352, with $90,702 allocated to the land and $295,650 to the improvements. (Id. at 4.) The AV for the 2003-04 tax year was increased from $35,912 to $221,907. (Id.) *Page 5 
 II. ANALYSIS
The issue in this case is the RMV of the subject property. The tax years at issue are 2003-04 through 2008-09 because Defendant added omitted property value for all of those years. Plaintiff estimated the value as of January 1, 2008, which is the assessment date for the 2008-09 tax year. Defendant began by estimating the value as of January 1, 2003, the assessment date for the 2003-04 tax, and then trended that value forward through tax year 2008-09.
A. Real Market Value
RMV is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[5] See ChartDevelopment Corp. v. Dept. of Rev.,16 OTR 9, 11-13 (2001) (discussing the concept of RMV). There are three traditional methods used to calculate RMV: the cost approach, the income approach, and the sales comparison or market approach.Allen v. Dept. of Rev., 17 OTR 248, 252 (2003); see also
OAR 150-308.205-(A)(2) (stating that all three methods must be considered in determining a property's RMV even if all cannot be applied).
Neither party found the income approach appropriate for Plaintiff's property because Plaintiff's property is not used to generate income. The court agrees that approach has no relevancy in this case. See Appraisal Institute, The Appraisal of RealEstate 447 (13th ed 2008) (stating that "[a]ny property that generates income can be valued using the income capitalization approach"). See also Magno v. Dept. of Rev.,19 OTR 51, 55 (2006) (noting that the income approach is "not often used in the valuation of single-family homes"). The dispute, therefore, / / / *Page 6 
centers on the sales comparison and cost approaches, although most of the evidence from both parties pertained to the sales comparison approach.
B. Plaintiff's Value Evidence
Plaintiffs appraiser McKern estimated the value of the property to be $400,000 as of January 1, 2008. (Ptf s Ex 1 at 14.) McKern's opinion of value is based on three comparable properties in fairly close proximity to the subject. (Id.) McKern's comparable #1 is an active listing of a double wide manufactured home similar in size to the subject, located in the Deadwood district within one or two miles of the subject. That property is on a creek, has approximately the same amount of acreage as the subject (38 acres versus approximately 39 acres for the subject), and was being offered for $565,000 in January 2008, which is the month of assessment for the 2008-09 tax year. (Id.) According to McKern, that property was still listed for sale in February 2010, but the asking price was reduced to $445,000. (Id.) After adjusting for various differences in features and amenities, McKern arrived at an adjusted sale price for that property of $595,300 or $305.74 per square foot. McKern testified that he gave that comparable little weight because, although it was close in proximity to the subject, it had a manufactured home whereas the subject is a newer stick built home.
McKern's two other comparables are in Greenleaf, some 15 miles from the subject. (Id.) McKern's comparable #2 sold in September 2007 for $298,900 or $137.62 per square foot. (Id.) That comparable is a slightly larger, one and one-half story home, with approximately 200 square feet more living space and twice the number of bedrooms (four bedrooms versus the subject's two). It also has roughly half the land, 17 acres. McKern made numerous adjustments for differences between that property and the subject with $90,500 total net adjustments. He arrived at an adjusted sale price of $389,400. (Id.) McKern's third comparable is another one *Page 7 
and one-half story, four-bedroom home, slightly smaller than the subject by approximately 250 square feet, and situated on approximately one-third the land as the subject, 12 acres. (Id.) That property is considerably older than the subject in terms of actual age, 62 years, and sold for $308,000 or $179.49 per square foot in January 2007. (Id.) The home had apparently been either well-maintained or renovated because McKern places the effective age at 20 years. (Id.) McKern again made numerous adjustments for differences between comparable #3 and the subject and arrived at an adjusted sale price of $402,200. (Id.)
Plaintiff submitted a letter from the realtor Leslie. (Ptf s Ex 1 at 20.) Leslie began his letter by commending Plaintiff and his wife, Kathy, for the improvements they made to the property since their purchase, which he characterized as "astronomical." (Id) Leslie then states that while Plaintiffs property "would sell for approximately $525,000" if it were within 15 minutes of the city of Eugene, Plaintiffs property would likely "have listed on the 1st of [] January 2008, between $375,000 and $400,000." (Id.) Plaintiff testified that he believed the property would sell for $525,000 if it were closer to Eugene. Plaintiff testified that he had recently received two telephone calls from prospective buyers interested in the property, provided they could have the railroad. Plaintiff testified that there was uncertainty about the railroad because he built it without any permits and there is a question as to whether the relevant governing authorities would allow the railroad to remain on the property. Given all that, Plaintiff testified that he would probably sell his property for $400,000.
Both of Plaintiff s appraisal witnesses testified extensively about the challenges to valuing the subject property due to its remote location and unique features. Plaintiffs representative insists that location is critical to the case and the key element in arriving at the value. *Page 8 
Plaintiff testified that there have only been approximately 12 properties for sale in the Deadwood area in the past 10 years, and he is aware of only two sales in the past eight years.
C. Defendant's Value Evidence
Chapman testified that a lot line adjustment 2001 that did not get "processed" by the assessor's office at the time caused the property account to be "tagged." Chapman and Madsen inspected the property on May 2, 2009, and, while Plaintiff permitted them to "look around the property," he denied them access to the interior of his home. According to Madsen's testimony, she and Chapman were at the property for approximately one hour. Chapman and Madsen measured the structures and asked Plaintiff some questions. Apparently, it was at that time that Chapman learned that the house had not been simply renovated, but had been rebuilt. Madsen testified that she made a second site visit in January 2010, and that Krehbiel accompanied her on that trip. One or both of the two were allowed inside the home at that time.
In testifying about the scope of the omitted property assessment, Chapman testified that Plaintiff told her during the May 2, 2009, inspection, that he had finished the roof on the house in 2001. Based on that and other information and observations, Chapman concluded that Plaintiff completed construction of the home in 2001. However, because of the limits of the omitted property statute, Defendant only added omitted property back to the 2003-04 tax year.
In establishing the omit values for purposes of assessment and taxation, Chapman testified that she began with an estimation of the value for the 2003-04 tax year, and then applied trending to arrive at the values for subsequent years. Madsen testified that the omitted property assessment also included additional value for the renovation of a barn, the addition of certain outbuildings, landscaping, and the declassification of some of the property from forestland *Page 9 
special assessment. Those features were included in the 2003-04 omit assessment. Madsen testified that additional values were added, beginning with the 2005-06 tax year, to account for the addition of "hay cover," a utility shed, and an "update" of the landscaping to "excellent." Krehbiel was Defendant's key witness. He testified to the assessor's method of valuing the property, including the railroad. Krehbiel testified that he approached the valuation of the mile-long railroad by consulting two cost reporting sources, but could not use either because one was silent on railroad valuation and of the other focused on the value of commercial railroads. Krehbiel testified that he considered the salvage value of the railroad based on an estimated 50,000 pounds of rail, but, in the end, relied on Plaintiffs statement that he spent approximately $200,000 on the railroad. Krehbiel reduce that number by 70 percent to account for functional obsolescence and arrived at an estimated value of $60,000. Defendant noted that that was roughly one-half the amount Plaintiff was trying to sell the railroad for in 2010.
Krehbiel valued the property as a whole based on six comparable sales that took place between January 1, 2001, and April 4, 2005, for prices ranging from a low of $360,000 (comparable #3) to a high of $485,000 (comparable #2). (Def s Ex L.) In arriving at his opinion of value, Krehbiel testified that he considered two important factors: 1) the year; and 2) properties of similar quality and class, on acreage, with a number of outbuildings. As for the "year," Krehbiel testified that he was looking for values that would align with the omitted property assessment, to see if the values placed on the roll were supported by market data. It was for that reason he selected sales spanning four and one-half years. The subject is on approximately 39 acres, and Krehbiel's comparables are on acreages between 20.51 and 39.05 acres. (Id.) Krehbiel testified that his best comparables were numbers two, three, and four, which had unadjusted sale prices of $485,000, $360,000, and $469,000, respectively, in *Page 10 
October 2002, June 2002, and September 2003. Krehbiel felt that those sales supported the values on the rolls after the omitted property assessment. Again, his objective was to evaluate the January 1, 2003, value, which was then trended for subsequent years.
D. Court's Reconciliation
The burden of proof in the Tax Court is a "preponderance" of the evidence, and falls upon the party seeking affirmative relief which, in this case, is Plaintiff. ORS 305.427. The Oregon Supreme Court as stated that:
 "`Preponderance' derives from the Latin word `praeponderare,' which translates to `outweigh, be of greater weight.' 8 Oxford English Dictionary 1289 (1933). With regard to the burden of proof or persuasion in civil actions, it is generally accepted to mean the greater weight of evidence."
Riley Hill General Contractor v. Tandy Corp.,303 Or 390, 394, 737 P2d 595 (1987). This court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept. ofRevenue, 4 OTR 302, 312 (1971).
While the court could go into great detail as to the concerns it has about the quality of the evidence both sides presented, in the end, the court is not persuaded by a preponderance of the evidence that Plaintiff's property was worth only $400,000 on January 1, 2008.
Plaintiff's appraiser McKern gave all three of his comparables a $30,000 negative adjustment for "functional utility." There was no explanation for that adjustment. Plaintiff gave no value to the railroad because it was a nonconforming use, yet Plaintiff had it for sale for between $120,000 and $135,000 as a personal property asset. Plaintiff's appraisal witnesses were certainly qualified, but their conclusions simply not credible. McKern made the $30,000 functional obsolescence adjustment based on the word of his client, who has no apparent training or qualification in valuing property. For McKern to accept Plaintiff's recommended adjustment without verification is unusual to say the least. Leslie is also well-qualified, but did not *Page 11 
adequately explain how he arrived at his opinion of value.
Plaintiff did an extensive amount of work to the property after his acquisition in 1995. He tore down and completely rebuilt the 1,900 square foot house, a project that included constructing a new concrete foundation, he added or remodeled at least one barn and shop, did extensive landscaping, and added a mile-long railroad line. The addition of the railroad line included the construction of a concrete tunnel and a bridge that allowed the train to cross the creek. Plaintiff also added approximately 100,000 pounds of rock to the creek to preserve the creek for spawning salmon.
Plaintiff did not present evidence substantiating the costs associated with the work he did on the property that was included in the omitted property assessments and did not even present a specific dollar amount spent. Moreover, Plaintiff testified that he and his wife did all, or at least the majority, of the work. By acting as the contractor, Plaintiff saved money. Money spent building and remodeling structures translates into value, in this case, value above whatever the costs were. Also, the extent of the work Plaintiff did was extreme, and it is simply difficult to accept that the total RMV was only $400,000 as of January 1, 2008. It is even more difficult to believe that the total RMV of the structures on the property (the home, barn, and numerous other outbuildings) was only $149,740 on January 1, 2008, as Plaintiff asserts (Plaintiff accepts Defendant's January 1, 2008, land RMV of $250,260, which, when subtracted from Plaintiffs $400,000 total RMV, leaves an improvement RMV of $149,740). That $149,740 improvement RMV estimate would translate into a value of between $76.50 and $82.65 per square foot for the house alone, and attribute no value to any of the eight or nine outbuildings, depending upon whether Plaintiffs or Defendant's square footage is used. Certainly the large remodeled barn has value. *Page 12 
There was also evidence of a second appraisal Plaintiff paid for but never produced. Plaintiff acknowledged he paid for another appraisal, but testified that he never received the written report because the appraiser used sales from the Junction City area which Plaintiff did not feel were comparable. Moreover, Plaintiff insisted he could not remember that appraiser's opinion of value.
It is true that Defendant did not make adjustments to his comparables and that four of Krehbiel's six comparable sales (comparables #2, #3, #5, and #6) are a considerable distance from the subject (approximately 50 miles away) and in close proximity to the city of Eugene. (Ptf s Rebuttal Ex 1 at 8 through 16.) However, all of the appraisers, both Plaintiffs and Defendant's, spoke to the challenge of finding properties comparable to the subject. In such cases it is not uncommon for an appraiser to cast a wider net. Given the uniqueness of the subject, the "neighborhood" within which a prospective buyer would look to find similar properties is likely much larger than would be the case for a standard three bedroom, two bath home in a city like Eugene.
Plaintiffs highest adjusted comparable sale, comparable #1 is $595,300 (Ptf s Exhibit 1 at 14), which is very close to Defendant's 2008 RMV of $608,000. Plaintiff placed no value for the railroad, even though he had for sale for between $120,000 and $135,000, and Plaintiff appraiser makes a $30,000 negative adjustment to each of his comparable sales (for functional obsolescence) based on Plaintiffs unexplained and unqualified statements to his appraiser. Defendant estimates the value of the railroad to be approximately $60,000. Adjusting Plaintiffs comparable #1 for those two items suggests a value of $685,000 as of January 1, 2008 (2008-09 tax year), a number considerably lower than the $608,000 RMV on the roll for that year after the *Page 13 
value increase attributable to the omitted property assessment and Plaintiff's comparable #1 is a manufactured home.
In closing, although not clearly stated, it appears that Plaintiff spent close to $500,000 building the house (and perhaps the barn and other outbuildings), plus the railroad. That work was all done on or before 2001. Considerable additional work was done before 2003, which is the first year of Defendant's multi-year omitted property assessment. The roll value after the omitted property assessment is $386,352 (RMV). The evidence shows that the market rose from 2003 for several years. Plaintiff's $400,000 value estimate as of January 1, 2008, simply does not align with those facts and is completely unrealistic. Plaintiff owns a beautifully landscaped 39 acre property with a newer home and multiple outbuildings, numerous ponds, a creek and seasonal waterfalls, that is partially treed. The property can be viewed intimately on foot or by riding Plaintiff's mile-long railroad. One might easily describe the subject property as "parklike." Plaintiff has a sign at the entrance to his property that reads "Robinson State Park." (Def's Ex T at 24.)
 III. CONCLUSION
After lengthy and careful evaluation of all of the evidence and testimony in this case, the court concludes that Plaintiff has failed to prove his case by a preponderance of the evidence. Now, therefore, *Page 14 
IT IS THE DECISION OF THIS COURT that Plaintiffs appeal is denied and the values on the rolls following the omitted property assessments for tax years 2003-04 through 2008-09, inclusive, are upheld.
Dated this ___ day of June 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Dan Robinsonon June 10, 2011. The Court filed and entered this documenton June 10, 2011.
[1] Defendant considered the home as a three-story structure because the home is built on a hill with ingress and egress from the basement to the outdoors.
[2] The size of the property varies according to document. The court will use 39 acres as cited in Plaintiff's Exhibit 1.
[3] Defendant's Exhibit T is a document created by Plaintiff.
[4] Plaintiff testified the old home was built in1935, while Defendant uses 1898 as the date built.
[5] Unless noted otherwise, references to the Oregon Revised Statutes (ORS) are to 2007. The court notes that the statute defining RMV was not amended between 1997 and 2007.

 *Page 1