DECISION
Plaintiff appeals the real market value and exception value of property identified as Account 00227793 (subject property) for the 2009-10 tax year. A trial was held by telephone on April 5, 2011. Geoff Bennett (Bennett), Appraiser II, appeared and testified on behalf of Plaintiff. Defendant appeared and testified on his own behalf. Chris Paulson (Paulson), Paulson Appraisal Inc., testified on behalf of Defendant. Plaintiffs Exhibits A and B were offered and received without objection. Defendant's Defense Brief, Brief Amended, and Exhibits E, F, G, H, I, J, J-1, K, L, M, N, O, P, P-1, and Q were offered and received without objection.
 I. STATEMENT OF FACTS
The subject property is "zoned R-8.5 (Residential 8,500 SF minimum) in an unincorporated area of Lake Oswego." (Ptf s Ex A at 1.) The subject property includes a 2,890 square foot dwelling that is a single-level ranch style home. (Id.) The subject property was built in 1958, but Plaintiff determined the effective year to be 1991 after the recent remodel. (Ptf s Ex A at 2.) The subject property includes an in-ground pool. The subject property lot is 15,400 square feet and is located on Bonita Road in a "non-homogenous" area. (Ptf s Ex A at 1, 2.) Defendant testified that the subject property is across the street from the Hunt Club apartments. (See Def s Ex J at 1, 4.) Defendant testified that the subject property has a small *Page 2 
front yard and is on a larger street with a double yellow line. (Id. at 2.) He testified that other properties near the subject property include a rental house, an older ranch style home, a Marriott Residence Inn, and the Hunt Club apartments. (Id. at 3, 4.)
Defendant is a home builder with 20 years of experience. Defendant completed "a recent major addition and full remodel * * * [that] was valued at 45% complete for the 2008/2009 tax year and * * * completed prior to the January 1, 2009 assessment date." (Ptf s Ex at 1.) 1,450 square feet of living area was added through the remodel. (Ptf s Ex B at 1.) Defendant testified that he has lived in his neighborhood for ten years and was hoping to remodel the subject property to show it in an upcoming home builders show. He testified that, when the market crashed, he cut costs of the remodel any way he could. Defendant testified that he likes his neighborhood and plans to retire in the home.
Plaintiff submitted the evidence presented by Defendant to the board of property tax appeals, including actual costs for the remodel. (See generally Ptf s Ex B.) Bennett testified that the actual cost information is evidence of Plaintiff s requested 2009-10 exception value of $187,178. Defendant's total reported construction costs for the remodel were $306,286. (Ptf s Ex B at 7, 38.) Of that total cost, $125,281 was incurred in 2007 and $181,005 was incurred in 2008. (Id. at 7.) Defendant testified that the construction costs reported by Plaintiff are accurate. The "Overview" of the remodel states:
 "The existing 1958 ranch was 60' by 24' before an addition was constructed beginning in September 2007 and completing in October 2008. The existing ranch was in average condition and it was a three bedroom one bath home with a small in ground pool. Prior to the remodel, the 2007 RMV as computed by Clackamas County was $133,474 land; $178,140 building; for a total of $311,614; a $73,000 increase in the two years prior to construction."
(Ptf s Ex B at 1.) A summary of the "[r]emodel of the existing building" reported that: "[n]ew windows, door, siding, and roofing were installed[;] [d]rywall and wood floors were patched; the *Page 3 
new and existing structures were connected together with a hallway." (Id.) The "[n]ew construction" summary states that:
 "1,450 Sq. Ft. of living area was added including a master bedroom, master bathroom, den, laundry, guest room and hallway. A 742 Sq. Ft. attached garage was added. Two covered patios were added to the back of the home and a covered entry was added at the front of the home totaling 513 Sq. Ft. Concrete patios and walkways, totaling 462 sq. ft., were replaced with new."
(Id.)
A. Plaintiff's appraisal
Bennett analyzed the value of the subject property using both the sales comparison and cost approaches. He testified that he did not use the income approach because the subject property is not an income-producing property.
1. Sales comparison approach
Bennett testified that the subject property is very large and he had to look beyond the one mile range to find comparable properties. He looked primarily for single-level homes, but included one split-level home:
 "With the exception of comparable #5, all sales that could be identified within a one mile radius of the subject [property] and that were close in square footage to the subject [property], were brand new two story dwelling[s]. It was felt that these homes were too different for proper comparison to the subject [property]. Comparable sales of one level ranch homes were felt to exhibit the best evidence for estimating the subject [property's] market value."
(Ptf's Ex A at 6.)
Bennett testified that he made adjustments for differences in time, square feet of living space, basement space, garage space, additional bathrooms, fireplaces, in-ground pools, and age. (See id.) For sales that occurred in 2008, Bennett used an adjustment of -1.08 percent per month. (Id.) For sales that occurred in 2009, Bennett used an adjustment of 1.4 percent per month. (Id.) Bennett used an adjustment of $50 per square foot for above grade living area and $40 per square *Page 4 
foot for basements. (Id.) "Adjustment values were derived from the market and from the Oregon State Cost Factor Book and adjusted to the local market." (Id.) Bennett did not adjust for "quality/design" because he found all of the comparable properties to be sufficiently similar to the subject property in that respect. (Id.)
Bennett testified that Comparable 1 is a ranch-style home located 2.50 miles from the subject property that is similar in square feet and age to the subject property; it sold on October 17, 2008, for an adjusted sale price of $572,146. (See Ptf's Ex A at 2.) Bennett testified that Comparable 2 is a single-level ranch style home located 2.00 miles from the subject property that is similar to the subject property in age, square feet, and inclusion of an in-ground pool; it sold on May 6, 2008, for an adjusted sale price of $622,752. (Id.) Comparable 3 is located 2.00 miles from the subject property; it sold on December 24, 2008, for an adjusted sale price of $604.000. (Id.) Bennett testified that Comparable 4 is a single level ranch style home located 1.25 miles from the subject property that is a little newer than the subject property, but still competitive due to the remodel; it sold on November 10, 2008, for an adjusted sale price of $519,724. (Id.) Bennett testified that Comparable 5 is the closest in proximity to the subject property, 0.75 miles, but is a split-level home. (Id.) Comparable 5 sold on July 31, 2008, for an adjusted sale price of $596,954. (Id.) Bennett testified that Comparable 6 is a single-level ranch style home located 2.25 miles from the subject property that is smaller than the subject property; it sold on January 29, 2009, for an adjusted sale price of $566,015. (Id.)
Bennett found the "range of adjusted sales prices" of the six comparable sales to be $519,724 to $622,752. (Ptf's Ex A at 13.) Bennett testified that he gave the most weight to Comparables 1 and 2 and secondary weight to Comparables 3, 4, and 6. He testified that he used Comparable 5 only as supporting evidence due to the different design style, split level. Bennett's *Page 5 
Comparable 5 is the same as Defendant's Comparable 4. (See Ptf s Ex A at 2; Def s Ex I at 6.) Bennett testified that he did not make adjustments for lot size because he could not identify market data to determine what the lot size adjustment should be.
Defendant testified that four of Bennett's comparable sales are in the "Palisades" or "Lower Palisades" area, which is a neighborhood southeast of the subject property. Bennett testified that he considers both the subject property neighborhood and the Palisades to be non-homogenous; the properties are varied with respect to age and type of property. Defendant testified that Plaintiffs comparable sales are located near Lake Oswego and that the lots are larger and heavily wooded. He testified that there is more space between the lots and that they are in a more desirable, homogenous neighborhood. Defendant testified that none of Plaintiffs comparable sales are located in his neighborhood, on Bonita Road near Interstate 5 and Kruse Way. He testified that he does not consider the Palisades area to be comparable. Defendant testified that Bonita Road, where the subject property is located, experiences heavier traffic than the Palisades neighborhood, where Plaintiffs comparable sales are located.
Defendant testified that he visited Plaintiffs comparable properties and took several pictures of each. (Def s Ex J-1.) He testified concerning Plaintiffs comparable sales: Plaintiffs Comparable 1 is located on a golf course (Id. at 5); Comparable 2 is located on a very rural road without a yellow line or nearby commercial property (Id. at 6); Comparable 3 is on a lightly-travelled cul-de-sac (Id. at 7); Comparable 4 is located on a cul-de-sac that includes sidewalks and street improvements not present by the subject property (Id. at 11); Comparable 5 is on a street that dead ends at wooded green space (Id. at 12); and Comparable 6 is also on a more lightly-travelled street (Id. at 13). Defendant's appraiser, Paulson, testified that the proximity of Plaintiff s Comparable 1 would have a positive impact on its value. *Page 6 
Bennett also provided two listings near the subject property on Bonita Road: one listing is for $819,000; the other is for $698,950. (Ptf's Ex A at 19, 20.) Defendant stated that the first property had been on the market for 440 days and the other is in a 20-lot subdivision, which is homogenous. Bennett testified that he agreed that subdivisions, generally, are homogenous, but stated that the specific subdivision is within one mile of the subject property and is, therefore, part of a larger non-homogenous neighborhood.
2. Cost approach
Bennett identified three sales of bare land in Lake Oswego: Sale 1 is a 0.62 acre "flag lot * * * and sold for $170,000 in April 2008"; Sale 2 is a 0.34 acre lot that "sold for $260,000 in January 2009"; and Sale 3 is a 0.25 acre lot that "sold for $225,000 in October 2008." (Ptf's Ex A at 11.) "Sale #1 is within a half mile of the subject [property] and due to its proximity will be given the most weight for estimating value." (Id.) Bennett testified that Sale 1 is on a major thoroughfare. He testified that location on a major thoroughfare does not appear to influence value, but noted that lack of a sewer connection does affect value. Bennett testified that Plaintiff originally valued the land as not connected to sewer, noting that it costs about $20,000 to connect to sewer. Bennett concluded a land value of $200,000 for the subject property.
Defendant testified that Sale 1 abuts a green space and Sale 3 is in an unincorporated area of Lake Oswego on the north side of the Tualatin River. He testified that traffic patterns near Sale 3 and the subject property are similar. Defendant characterized all three land sales as "secluded and wooded," unlike the subject property.
Bennett explained his determination of improvement costs as follows: "[c]onstruction costs are derived from the Oregon Department of Revenue Cost Factor Book adjusted for location and time. Depreciation is based on studies done by our office in the Clackamas County *Page 7 
Area." (Ptf's Ex A at 12.) Using a value of $130 per square foot for the dwelling and $55 per square foot for the garage, Bennett concluded a replacement cost new of $417,280 for the subject property. (Id.) Bennett used a rate of 12 percent for a depreciated cost of improvements of $367,205. (Id.) Adding $38,000 for "As Is Value of Other Site Improvements," Bennett concluded a value under the cost approach of $605,205. (Id.)
Using both the cost and sales comparison approaches, Bennett concluded a real market value of $600,000 for the subject property as of January 1, 2009. (Id. at 13.)
B. Defendant's value evidence
Defendant provided an appraisal report completed by Paulson. Defendant testified that he located Paulson through a bank in Lake Oswego that makes loans to new builders; he sought an appraiser who specialized in Lake Oswego new construction and the bank recommended Paulson. Defendant testified that he had no other relationship with either the bank or Paulson.
Paulson testified that he has been an appraiser for more than 10 years and that he specializes in properties in the Lake Oswego and West Linn areas. Paulson's appraisal report was submitted as Defendant's Exhibit I. Paulson testified that he considered and adjusted for many factors, including location and traffic impact. Paulson testified that he did not find many bare land sales similar to the subject property. He testified that he noticed that traffic had a "significant impact" on lot values. Paulson testified that the Palisades neighborhood is a more desirable, "homogenous" neighborhood. He testified that he would never use a sale from that neighborhood as a comparable sale for the subject property. Paulson testified that the proximity of the Hunt Club apartments and the Marriott Residence Inn did not reduce the value of the subject property with the exception of the increased traffic. Paulson estimated that approximately 5,000 cars drive down Bonita Road each day. He testified that it is hard to *Page 8 
estimate the number of cars per road in an entire neighborhood, but considers there to be less traffic in the Palisades neighborhood generally than in the area surrounding the subject property.
Paulson testified that location, lot size, and view all have a significant impact on lot value. He adjusted for each of those factors when comparing properties to the subject property. Paulson testified that location is the most important factor. He testified that his lot adjustments were based on comparable properties on Bonita Road; he used older sales from Bonita Road to determine the appropriate site adjustment. Paulson testified that he looked at differences in site size and view to see if those factors accounted for differences in price, then determined appropriate adjustments based on location. He testified that he does not think the swimming pool contributes much to the value of the subject property.
Paulson testified that he searched for comparable sales that bracketed the subject property in terms of square feet but did not find any in the same neighborhood. He testified that the subject property is an anomaly in its neighborhood. In response to a question from Bennett, Paulson conceded that it might be appropriate to consider properties in other neighborhoods, but location adjustments would be necessary. Paulson conceded that most of his sales were older; four occurred in 2006 or 2007 (Comparables 1, 2, 3, and 7) and three occurred in the second half of 2008 (Comparables 4, 5, and 6). (Def's Ex I at 4, 6, 7.) He stated that he thought it was more important to find properties in the same neighborhood as the subject property.
Paulson testified that Comparable 1 a split level house and that he made an adjustment of $25 per square foot for the lower level and $35 per square foot for above grade space; he reported a sale price of $310,000 based on the multiple listing service, but did not check the deed. (See Def's Ex I at 4.) Bennett testified that the deed states the sale price as $320,000. Paulson responded that that sale price is still within the range that he identified. *Page 9 
Defendant's Comparable 4 on Parkhill Street, 0.59 miles from the subject property, was also selected by Bennett as his Comparable 5.[1] (Def's Ex I at 6; Ptf's Ex A at 2.) Paulson testified that his Comparable 4 is the most similar in size to the subject property and, like the subject property, has been remodeled. He testified that Comparable 4 is a split level house, but it is primarily above grade and the lower level has windows all around, so he treated the entire living space as above grade. Paulson testified that Comparable 4 is in a significantly better neighborhood than the subject property; it is on a dead end by a protected green space. He estimated that only 10 to 15 cars drove by the property each day. Paulson testified that he adjusted the sale price by $50,000 for the "site," including both lot size and location; he stated that it is an error for Plaintiff not to make a similar adjustment.
On cross examination, Paulson testified that whether a property has septic rather than sewer likely has some affect on the site value, but probably not much. He did not make adjustments for septic because he considers any such adjustment very minor. Bennett testified that, based on his study of two flag lots, the use of septic rather than sewer accounted for a $70,000 difference in value. Bennett stated that Paulson's Comparable 2 is on sewer and his Comparable 3 is on septic, and suggested that that difference might account for the approximately $63,000 difference in the adjusted sale prices. Paulson stated that he does not think that large a difference is due to the use of septic rather than sewer, but acknowledged that it is possible. He noted that his Comparables 2 and 3 differ significantly with respect to site size.[2] Paulson testified that a brand new septic tank costs, at most, $15,000 or $16,000. Bennett stated that it costs about $50,000 to connect to sewer for a home on Bonita Road. Paulson responded *Page 10 
that cost to build does not necessary equal the resulting increase in market value; for instance, it might cost $50,000 to connect to sewer, but only increase value by $30,000. Paulson stated that other factors, such as higher property taxes in Lake Oswego might contribute to price differences. Bennett testified that Paulson's Comparable sales 5, 6, and 7 are all on septic. Paulson conceded that that information would probably increase the value of those comparables by approximately $30,000, but that is a conservative estimate. Paulson testified that his value of $450,000 for the subject property is well-supported despite those increases.
Bennett noted that Paulson's price per square foot varied widely. Paulson reported a price of $274.82 per square foot Comparable 1; $424.80 per square foot for Comparable 2; $224.47 per square foot for Comparable 3; $239.60 per square foot for Comparable 4; $222.43 per square foot for Comparable 5; $213.71 per square foot for Comparable 6; and $255.61 per square foot for Comparable 7. (Def s Ex I at 4, 6, 7.) Bennett stated that, even using the lowest price per square foot, $213.71, yields a value of over $600,000 for the subject property.
Based on the sales comparison approach, Paulson concluded a value of $450,000 for the subject property. (Def s Ex I at 4.) Paulson analyzed the value of the subject property using the cost approach but did not place any emphasis on that approach because he found sufficient comparable sales. Paulson's indicated value under the cost approach was $534,774. (Id at 5.) Paulson concluded a value of $450,000 for the subject property as of January 1, 2009. (Id at 4.)
Both Plaintiff and Defendant provided an appraisal completed for OnPoint Community Credit Union indicating a value on November 7, 2008, of $675,000. (Def s Ex G; Ptf s Ex B at 12, 13.) Defendant testified that it was conducted for the purpose of obtaining a bank loan. Defendant also provided an appraisal indicating a value on November 12, 2008, of $745,000. (Def s Ex H.) He testified that he submitted both appraisals to show that appraisals for bank *Page 11 
loans are unreliable and can support any value. Defendant testified that, in each of those appraisals, the appraiser "massaged" the numbers to get the value desired by the bank. He noted that none of the comparable properties used in either of the November 2008 bank appraisals included comparable sales on Bonita Road, but he did not care because he wanted the loan.
Plaintiff requests a 2009-10 real market value of $600,000 for the subject property and exception value of $186,178. (Ptf's Ex A at 13.) Defendant requests that the court lower the 2009-10 real market value of the property to $450,000.
 II. ANALYSIS
The first issue before the court is the real market value of the subject property for the 2009-10 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citingGangle v. Dept. of Rev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [3] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."
Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept. ofRevenue, 4 OTR 302, 312 (1971). Plaintiff "must establish by competent evidence what the appropriate value of the property was as of the assessment date in question." Woods v. Dept. ofRev., 16 OTR 56, 59 (2002). *Page 12 
A. Approaches of Valuation — Real Market Value
There are three approaches of valuation that must be considered in determining the real market value of a property even if one of the approaches is found to be inapplicable: cost, income, and comparable sales. See ORS 308.205(2); OAR 150-308.205-(A)(2)(a). The subject property is a residential structure. Plaintiff and Defendant relied on the sales comparison approach. Plaintiff also relied on the cost approach. Defendant provided a value under the cost approach, but did not rely upon that value. Neither party considered the income approach.
1. Sales Comparison Approach
The sales comparison "may be used to value improved properties, vacant land, or land being considered as though vacant."Chambers Management Corp and McKenzie River Motors v. Lane CountyAssessor, TC-MD No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute, The Appraisal of Real Estate 335 (12th ed 2001). "Under the sales comparison approach, the value of a property is derived by comparing the subject property with similar properties, called comparable sales." That comparison is based on many factors, and adjustments are made for any differences between the comparable sales and the subject property so that the appraiser can derive a value for the subject property." Magno v. Dept. of Rev.
(Magno), 19 OTR 51, 58 (2006) (citations omitted); seealso OAR 150-308.250-(A)(2)(c) ("In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used"). Thus, "[t]he court looks for arm's length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of the subject property.Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003). *Page 13 
The court has reviewed both parties' appraisal reports and heard testimony concerning the comparable sales considered and the adjustments made. The court finds that neither parties' sales comparison approach is entirely reliable, but each provides some persuasive information as to the value of the subject property as of January 1, 2009. Defendant testified persuasively that Plaintiff's comparable sales are all located in more desirable locations than the subject property and are subject to less traffic impact than the subject property. The court agrees with Defendant that adjustments should have been made to Plaintiff's comparable sales for location. Paulson selected comparable sales within a one-mile radius of the subject property. However, Paulson's comparable sales were all smaller than the subject property and were predominantly of an inferior condition than the subject property.[4] Additionally, Paulson did not make adjustments for differences in time or for connection to sewer rather than septic. The court determines a 2009-10 real market value of $540,000 for the subject property under the sales comparison approach.
2. Cost Approach
"`In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes.' * * * The cost approach is `particularly useful in valuing new or nearly new improvements.'" Magno,19 OTR at 55 (citing Appraisal Institute, The Appraisal of RealEstate 63.) "[A]ctual costs are relevant and often persuasive, but not controlling. That is because the task is to determine market value and, although different contractors may build the same *Page 14 
[property] for differing amounts, the completed [property] may sell for the same amount of money regardless of how much it cost to build." Murray v. Tillamook County Assessor, TC-MD No 090154C, WL 602442 at *2 (Feb 19, 2010).
Bennett concluded a value of $605,205 under the cost approach. (Ptf's Ex A at 12.) Paulson determined a value of $534,774 under the cost approach, but did not place any weight on the cost approach or testify concerning how he determined that value under the cost approach. (Def's Ex I at 4.) The court finds that Bennett's value of $605,205 is reasonable under the cost approach and accepts that value.
3. Reconciliation
The subject property is residential and both parties identified sufficient comparable sales occurring near the assessment date of January 1, 2009. Thus, the court affords the most weight to the sales comparison approach. The court gives some weight to the cost approach due to the recent remodel of the subject property. The court finds that the real market value of the subject property was $550,000 for the 2009-10 tax year.
B. Exception Value
The second issue presented is the 2009-10 exception value. Pursuant to ORS 308.149(5)(a)(A), "`[n]ew property or new improvements' means changes in the value of property as the result of: (A) [n]ew construction, reconstruction, major additions, remodeling, renovation or rehabilitation of property." New improvements do not include "[g]eneral ongoing maintenance* * * or; * * * [m]inor construction." ORS 308.149(5)(b). The value of new property and new improvements is commonly referred to as "exception value" and is determined under ORS 308.153(2)(a), which states: "The value of new property or new improvements shall equal the real market value of the new property or new improvements reduced (but not below *Page 15 
zero) by the real market value of retirements from the property tax account." Exception value "must exclude factors such as changes in inflation, market demand, and construction codes." Magno,19 OTR at 63, citing Hoxie v. Dept. ofRev., 15, OTR 322, 326 (2001). In determining the 2009-10 exception value, the court considers only that portion of the remodel that occurred between January 1, 2008, and January 1, 2009. See
ORS 308.153 (identifying the relevant improvements as those made "as of January 1 of the assessment year"); see also, e.g., Magno,19 OTR at 67.[5] As stated above, "`[t]he cost approach is `particularly useful in valuing new or nearly new improvements.'"Id. at 55.
The only evidence presented of the tax year 2009-10 exception value was the actual cost associated with the remodel of the subject property incurred in 2008. Plaintiff provided documents (originally prepared by Defendant) stating that the total cost of the remodel incurred in 2008 was $181,005. Defendant testified that Plaintiff's statement of the remodel cost incurred in 2008 is accurate. The court, therefore, finds that the 2009-10 exception value was $181,005.
 III. CONCLUSION
After carefully consider the testimony and evidence presented, the court finds that the 2009-10 real market value of the subject property was $550,000 and the 2009-10 exception real market value of the subject property was $181,005. Now, therefore, *Page 16 
IT IS THE DECISION OF THIS COURT that, for the 2009-10 tax year, the real market value of property identified as Account 00227793 was $550,000 and the exception real market value was $181,005.
Dated this ___ day of August 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Pro Tempore Allison R.Boomer on August 12, 2011. The Court filed and entered this documenton August 12, 2011.
[1] Bennett's appraisal states that the property is 0.75 miles from the subject property. (Ptf's Ex A at 2.)
[2] Paulson's Comparable 2 site size is reported as 21,055 square feet lot whereas his Comparable 3 site size is reported as 12,051 square feet. (Def's Ex I at 4.) Paulson made an adjustment of minus $10,000 for Comparable 2 and an adjustment of plus $5,000 for Comparable 3. (Id.)
[3] References to the Oregon Revised Statutes (ORS) and the Oregon Administrative Rules (OAR) are to 2009.
[4] Defendant's Comparables 4 and 7, which are listed as "good" condition and "similar" to the subject property. (Def's Ex I at 6, 7.) For Comparable 1, Paulson used an adjustment of $75,000 for an "average/inferior" condition. (Id. at 4.) For Comparables 2 and 5, he used an adjustment of $20,000 for "average +/sl. infer." Condition. (Id. at 4, 6.) Comparable 3, listed as "average +/sl. infer." Condition, received an adjustment of $30,000. (Id. at 4.) Comparable 6, described as "average +/infer." condition," received an adjustment of $40,000. (Id. at 6.)
[5] The remodel occurred over two years; it was begun in September 2007 and completed in October 2008. *Page 1