IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

GERALD WHITMORE )
and KAROL WHITMORE, )
)
        Plaintiffs, ) TC-MD 110450C
)
    v. )
)
DOUGLAS COUNTY ASSESSOR, )
)
        Defendant. ) **DECISION**

Plaintiffs appeal the real market value (RMV) of property identified as Account R28555

(subject property) for the 2008-09, 2009-10, and 2010-11 tax years. A telephone trial was held

on May 29, 2012. Roger A. Hartman, through duly executed power of attorney, appeared on

behalf of Plaintiffs. Gerald Whitmore (Whitmore) testified on behalf of Plaintiffs. Paul E.

Meyer, Douglas County Counsel, appeared on behalf of Defendant. Kim Rinnert, Registered

Property Appraiser I, testified on behalf of Defendant.

Plaintiffs' Exhibits 1 through 67, and Defendant's Exhibit A, were admitted without

objection.

## I. STATEMENT OF FACTS

The subject property is a 0.49 acre lot in Yoncalla, Oregon, improved with an 864 square

foot "general purpose building" with a loft area (referred to as a "shop"), and a 2,448 square foot

two-story home with an attached 576 square foot two-car garage, which was started in 2007 and

was not complete as of the January 1, 2010, assessment date for the last of the three tax years

under appeal. (Def's Ex A at 2.) The lower level is an 1,152 square foot basement / garage, and

the upper level is 1,872 square feet of finished living space "consist[ing] of 1872 [square feet] of

/ / /

main floor living space with three bedrooms, two full bathrooms and one half bathroom[].”
(*Id*. at 2)  Plaintiffs purchased the vacant land in 2005 for $50,000.  (*Id.*)

Whitmore testified that he and his wife set out to build a retirement home on the property and planned to do most of the work themselves.  In 2006, Plaintiffs built the metal wall shop, complete with a loft, electrical wiring, and a half-bath.  (*Id.*)  Whitmore testified that, in 2007, Plaintiffs constructed the basement of their new home and “camped” in it while resuming construction.  The 1,152 square foot lower “basement level”[1] consists of 576 square feet of living space described by Defendant as “low cost finished office” with a half-bath, and 576 square feet of “low-cost finished garage.”  (*Id*.)  Whitmore testified that he and his wife moved from the basement into the upper floor in October 2010.

The value of the subject property, as found by the assessor, was $143,286 ($70,793 for improvements; $72,493 for land) for the 2008-09 tax year, $193,780 ($115,502 for improvements; $78,278 for land) for the 2009-10 tax year, and $215,302 ($140,777 for improvements; $74,525 for land) for the 2010-11 tax year.  (Ptfs’ Compl at 5.)

Plaintiffs appealed the 2010-11 tax year value to the Douglas County Board of Property Tax Appeals (BOPTA), which found the value of the property to be $155,600 ($97,600 for improvements, $58,000 for land) for that tax year (2010-11).  (*Id*. at 2.)

On April 18, 2011, Plaintiffs filed their Complaint with this court, appealing BOPTA’s determination of value, as well as the values for the two previous tax years.  Plaintiffs request total RMVs of $86,325 for tax year 2008-09, $102,617 for tax year 2009-10, and $115,714 for tax year 2010-11.  (Ptfs’ Ex 41.)  Plaintiffs request maximum assessed values (MAVs) and

/ / /

---

[1] The home is built on sloping terrain.  The lower level is a “daylight” basement / garage.  The second story living space is above that lower level basement / garage.

assessed values (AVs) of $54,399, $67,649, and $80,411, respectively, for tax years 2008-09, 2009-10, and 2010-11. (*Id*.)

A.     *Land value*

Both parties relied solely on the sales comparison approach in valuing the real market value of the land.

1.     *Plaintiffs' valuation*

Plaintiffs proffered 11 comparable properties, all located in Yoncalla. (Ptfs' Ex at 1-13.) Four of those properties were listings of unsold property. (*Id*. at 1, 10-13.) Three of those four listings were active as of February 26, 2011. Two of the three listings were 0.16 acres and the third was 0.19 acres. The two smaller 0.16 acre lots were listed for $19,900, and the third 0.19 acre lot was listed for $31,500. (Ptfs' Exs 10, 11, 12.) The fourth lot is a 0.15 acre property that was being offered for auction by Douglas County for a minimum bid of $15,500. (*Id*. at 13.)

The seven remaining comparable sales had sales dates ranging from March 2009 to September 2010, sales prices from $19,900 to $55,000, and sizes from 0.15 to 0.46 acres, compared to the subject at 0.49 acres. (*Id*. at 1, 3-9.) Plaintiffs evidenced four of those seven sales with photographs of the properties as improved, along with handwritten captions of the street addresses, sales dates, and sales prices. (*Id*. at 3, 7-9.) Plaintiffs request land values of $39,000 for the 2008-09 tax year, $36,417 for the 2009-10 tax year, and $33,467 for the 2010-11 tax year. (*Id*. at 41.)

2.     *Defendant's valuation*

Defendant used four comparable sales to estimate the subject property's land value. In its appraisal, Defendant explained its methodology:

/ / /

"Unimproved lot sales range from $33,500 to $43,500 spanning from late 2006 to September 2011. * * * [Two comparable sales] in the same subdivision from late 2006 to late 2009 show a $1,500 increase in value. The monthly *time* adjusted percentage equals a % that equates to approximately $40.50 per month. A dollar per square foot was used to adjust the lot *sizes* as the lots ranged from 0.15 to the [subject property's] 0.49. The City of Yoncalla supplied costs for curbs and sidewalks at $1,000. Excavation costs were derived from the market. On site developments in Yoncalla are $17,000 minus $2000 adjustment for no landscaping. The result of these findings indicated the [subject property's] 2005 purchase price of $50,000 for a lot double to triple the size of the comps with split potential was still in line for 2008, 2009 and 2010."

(Def's Ex A at 3) (Emphasis added.) Comparable Sales 1, 2, and 3 have curbs and sidewalks, while Comparable 4 "is similar to the subject in topography and has no curbs and sidewalks." (*Id*.)

Defendant supplied an "Unimproved Land Sales Comparison Grid" that outlined the adjustments made to the four comparables; properties with sizes of 0.21 acres, 0.19 acres, 0.15 acres, and 0.34 acres (comparables 1-4, in that order). (*Id*. at 15.) The respective sales prices were $33,500, $35,000, $44,000, and $43,500. (*Id*. at 14, 15) Comparable Sale 1, sold November 2006, was time trended by Defendant 14 months forward to the January 1, 2008, assessment date. (*Id*.) The "TIME ADJ SALE PRICE" of Comparable Sale 1 increased to $34,068. (*Id*.) Comparable Sales 2, 3, and 4 were sold after the January 2008 assessment date, therefore, they were time trended back to that date. (*Id*.) Defendant also adjusted those three comparables upwards by the same $40.50 (rounded) per month it applied to its Comparable Sale 1. (*Id*.) Defendant adjusted each of its comparable bare land sales downward to account for amenities they had that the subject lacked. Specifically, Defendant subtracted $1,000 for curbs and sidewalks and $2,000 for topography. Defendant adjusted its Comparable Sale 4 for curbs, sidewalks, and topography, even though it appears to have lacked curbs or sidewalks, and was "equal in topog[raphy]" to the subject property (*Id*. at 14-15.) The values for the curbs and

sidewalk were "provided by the city of Yoncalla." (*Id*. at 15.) "Topography and support for the cities (sic) information was provided by Harold Thorp, who constructed a house in Yoncalla 2007." (*Id*.)

Defendant then multiplied the price of the property by "neighborhood recalculation and ratio study trends" to reach final real market value of the land of $69,550 for the 2008-09 tax year, $75,101 for the 2009-10 tax year, and $71,500 for the 2010-11 tax year. (*Id*. at 4-5, 56-79.)

B.    *Improvements value*

Both parties relied on the cost approach estimating the RMV of the improvements on the subject property. As of the date of trial, the home was still incomplete. The parties disagree as to the percentages of completion for the three assessment dates at issue. Plaintiffs contend that the home was 20 percent complete in 2008, 35 percent complete in 2009, and 55 percent complete in 2010. (Ptf's Ex at 41.) Plaintiffs submitted no evidence explaining how they computed the percentage complete for each of the tax years at issue. Defendant submitted a "COMPLETION CHECK LIST -- HOUSE" showing its calculations for the percentages complete for each year: 23 percent complete in 2008, 44 percent complete in 2009, and 63 percent complete in 2010. (Def's Ex A at 93.) Defendant states that "[t]he percent completes used on the form is verified from studies of cost from individual components and similar to fee appraiser bank new construction payouts." (*Id*. at 4.) The court accepts Defendant's percent complete estimates because they are based on an accepted methodology, whereas Plaintiffs provided no support for their estimates.

1.    *Plaintiffs' valuation*

In utilizing the cost approach, Plaintiffs relied on alleged actual price paid for materials. Plaintiffs submitted "Account QuickReport[s]" for each tax year at issue, showing the date,

location, and price of each material. (Ptfs' Ex at 15-17, 22-26, 31-33.) Plaintiffs did not submit any receipts or canceled checks, etc., to substantiate their reported costs.

Plaintiffs added "MISC EXPENSES" (which included "Labor concrete," "Engineering," "Delivery," and "Permits") of $3,792 to the material cost of $17,958.44 to reach a cost of $21,750 for the 2008-09 tax year. (*Id*. at 17-18, 41.) Plaintiffs added "MISC EXPENSES" (which, in this case, included "Delivery" and "Misc") of $363 to the material cost of $12,548.51 to reach a cost of $12,911 for the 2009-10 tax year. (Id. at 26-27, 41.) Plaintiffs' report material costs of $10,371.69 for tax year 2010-11. (*Id*. at 33, 41.)

Plaintiffs applied a flat rate of 50 percent of the annual material cost to estimate the cost of labor. Plaintiffs determined that the shop was worth $14,700 for all three years at issue. Using these values and applying their own determination of the percent complete, Plaintiffs request improvement RMVs of $47,325 for the 2008-09 tax year, $66,691for the 2009-10, and $82,247 for the 2010-11 tax year. (*Id*. at 41.)

During trial, Defendant challenged Plaintiffs' cost approach, stating that numerous costs were not reported, including trusses (delivery and crane), some permits, excavation costs, and transportation costs.

2. *Defendant's valuation*

Defendant described its cost approach methodology:

> "The dollar per square foot was derived from the LCM studies for each pertaining year based on the 1993 Department of Revenue Residential Cost Factor book. The local cost modifiers were determined by sales and cost of houses countywide for each year under appeal. (Pages 53-55) * * * The neighborhood recalculation and ratio study trends were applied accordingly. See Recalc and Trend studies for 2008, 2009 and 2010 on pages 56-79."

(Def's Ex A at 4.)

/ / /

DECISION  TC-MD 110450C                                                                 6

For each tax year at issue, Defendant calculated the cost of the main floor of Plaintiffs' house by multiplying the "DOR 93 Res Factor Book $/SF"; a "115% Class Quality '+' "; and the local cost modifier for the tax year at issue. (*Id.*) The "115% Class Quality '+' " stems from an October 1, 1999 memo from "Brian Lif/Karen Mason/Ken Vedder." (*Id.* at 49.) Defendant used a local cost modifier that equaled the "Projected LCI" of 140 percent in 2008; 118 percent in 2009; and 118 percent in 2010. (*Id.* at 4, 52.) Defendant provided tables used to calculate the local cost modifier. Those tables show a local cost modifier of 101 percent in 2008, 84 percent in 2009, and 103 percent in 2010. (*Id.* at 51.)[2] Defendant then calculated the cost of the basement by using a price per square foot of $34 in 2008, $28 in 2009, and $28 in 2010.

After multiplying the combined total of the cost of the home and the shop by its "neighborhood recalculation and ratio study trends" and percent complete, and taking the computed exception values into account, Defendant found the improvements RMV to be $61,622 for the 2008-09 tax year,[3] $94,000 for the 2009-10 tax year, and $120,711 for the 2010-11 tax year. (Def's Ex A at 5.) Defendant estimated the exception RMV to be $45,114[4] for the 2008-09 tax year, $36,442 for the 2009-10 tax year, and $31,391 for the 2010-11 tax year. (*Id.*) Applying the applicable change property ratio to each year, Defendant arrived at exception MAVs of $24,813, $21,865, and $21,659, respectively, for the three tax years at issue. (*Id.*)

/ / /

/ / /

---

[2] The court notes that the price per square foot used by Defendant for the main level of Plaintiffs' home is the same as the average price per square foot of the sample properties used in the local cost modifier calculation. Defendant did not directly use various cost factors from the Department of Revenue's Cost Factor book. (See Def's Ex at 4, 51.)

[3] The value, as reflected in Defendant's Exhibit A, was corrected by Defendant during trial.

[4] Defendant corrected that number at trial as well. The original number appearing in the report was $44,833.

## II.  ANALYSIS

At issue in this case is the RMV of Plaintiffs' land and improvements for the 2008-09, 2009-10, and 2010-11 tax years.  RMV is the standard used throughout the ad valorem statutes except for special assessments.  *See Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)).

RMV is defined by statute as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."  ORS 308.205(1).[5] "Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *."  ORS 308.205(2).

The Department of Revenue may adopt rules "to regulate its own procedure." ORS 305.100.  The Department of Revenue promulgated OAR 150-308.205-(A)(2)(a), which states:  "For the valuation of real property all three approaches – sales comparison approach, cost approach, and income approach – must be considered.  For a particular property, it may be that all three approaches cannot be applied, however, each must be investigated for its merit in each specific appraisal."

In the Tax Court, "a preponderance of the evidence shall suffice to sustain the burden of proof.  The burden of proof shall fall upon the party seeking affirmative relief * * *."  ORS 305.427.  In this case, Plaintiffs are seeking relief and thus bear the burden of proof.  This court has previously ruled that "preponderance" means "the more convincing or greater weight of

---

[5] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.  Although the 2007 editions are applicable to the 2008-09 and 2009-10 tax years, there are no material changes in the relevant provisions.

evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971)). In cases where a property's RMV is at issue, as here, "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). Finally, the legislature has given the court jurisdiction "to determine the real market value or correct valuation on the basis of the evidence before [it], without regard to the values pleaded by the parties." ORS 305.412.

A.    *Land value*

In valuing the land, Plaintiffs relied on the both the cost and sales comparison approaches. OAR 150-308.205-(A)(2)(c) states: "[i]n utilizing the sales comparison approach *only actual market transactions* of property comparable to the subject, or *adjusted to be comparable*, will be used." (Emphasis added.) A respected treatise differs slightly from the administrative rule by recognizing that listings as well as completed sales can be used by an appraiser in developing opinion of value. Specifically, the Appraisal Institute states in relevant part: "[i]n the sales comparison approach, the appraiser develops an opinion of value by analyzing closed sales, listings, or pending sales of properties that are similar to the subject property." Appraisal Institute, *The Appraisal of Real Estate* 297 (13th ed 2008); see also *Yarborough v. Dept. of Rev.*, TC 4974, WL 6739519 *2 (Dec 20, 2011). "The sales comparison approach is usually the preferred methodology for developing a site value conclusion." *The Appraisal of Real Estate* 362. Typically, listings are used as a check on a property's value, and this court does not give them the same weight it would give a sale.

/ / /

Four of Plaintiffs' comparable sales were unsold listings, thus, were not "market transactions." They were also much smaller in size and on the market after the assessment date for the latter of the three tax years under appeal. As for Plaintiffs' comparable sales, they made no adjustments to account for differences between those properties and the subject property, as required by OAR 150-308.205-(A)(2)(c). Further, a handwritten sales price and date below a picture of property is not reliable evidence of comparable sales data. Plaintiffs presented no evidence to show that the sales were arm's-length transactions including verification of each of the offered comparables. Plaintiffs have failed to meet their burden of proof in regard to the land RMV.

Defendant considered all three approaches of value, but also relied solely on the cost approach. Defendant calculated a $40.50 (rounded) per month increase in value based on the sale of two properties in the same subdivision, one in 2006 and the other in 2009. Using that time trend data, it follows that sales prices of properties sold *after* the January 1, 2008, assessment date would be *decreased* in value to calculate the time adjusted sales price. The difference between Defendant's comparable sales' prices and their time adjusted sales prices were all a result of the number of months from the assessment date, before or after, multiplied by $40.50. Additionally, Defendant deducted $3,000 for curbs, sidewalks, and topography from the net adjustment to all four comparable sales. That includes Comparable Sale 4, which did not have curbs or sidewalks and was equal in topography to the subject property. The $3,000 adjusted amount was, in part, provided by a Harold Thorp, who did not testify at trial. Due to the inconsistencies in Defendant's calculations, the court cannot rely on its evidence to determine the RMV of the land.

/ / /

Because Plaintiffs failed to carry their burden of proof and Defendant's evidence does not support a change to the tax roll, the court accepts the land RMV on the tax rolls for each tax year that was appealed.

B.     *Improvement value*

This court has previously noted that RMV "assumes an active or 'immediate' market by which value can be inferred from a number of transactions." *Watkins v. Dept. of Rev. (Watkins)*, 14 OTR 227, 229 (1997). There are instances where a property has no immediate market. Under Oregon law, "[i]f the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property." ORS 308.205(2)(c). As this court stated in *Watkins*, "[r]arely is there a market for partially completed structures. Accordingly, assessors commonly use the cost approach. That approach is generally accurate for new construction even when complete, but is particularly helpful in estimating the potential loss to an owner." 14 OTR at 229.

Plaintiffs did not consider the sales comparison approach or the income approach; Plaintiffs correctly relied on the cost approach. As this court noted in *Magno v. Dept. of Rev.* (*Magno*), "The cost approach is particularly useful in valuing new or nearly new improvements * * *. However, the cost approach is less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." 19 OTR 51, 55 (2006) (*quoting* Appraisal Institute, *The Appraisal of Real Estate* 63) (internal quotation marks omitted).

In *Magno*, the taxpayer presented extensive evidence at trial, including financial records of costs incurred. *Id*. The taxpayer testified that costs were kept low because she "did much work herself." *Id*. The court found that, although the evidence was extensive, the "ultminate cost estimate [was] uncertain and unreliable" because the taxpayer had failed to account for costs

relating to flooring, roofing, and decking. *Id*. at 56, 58. Additionally, the court pointed out that the "cost estimate [was] unsound for a more fundamental reason: taxpayer did not pay market price" for labor. *Id*. at 56.

Plaintiffs' case is similar to *Magno*. Plaintiffs did not include costs of the trusses, some permits, excavation, and transportation. Nor did Plaintiffs support their alleged costs with any reliable documentation such as receipts or canceled checks. Additionally, Plaintiffs provided no evidence of the cost of labor, and their flat rate of 50 percent of material costs for labor cost was unfounded and unsupported by their evidence. The percents complete used by Plaintiffs for each tax year were similarly unsupported by the evidence. Because Plaintiffs' evidence was incomplete, Plaintiffs failed to meet their burden of proof as to the subject property's improvements RMV.

Also, Defendant has not provided reliable evidence on which the court could properly "determine the real market value or correct valuation" of the improvements. ORS 305.412. In its cost approach, Defendant relied upon a "115% Class Quality '+' " value from an October 1, 1999 memo from "Brian Lif/Karen Mason/Ken Vedder." (Def's Ex A at 49.) Those individuals did not testify at trial, thus the "115% Class Quality '+' " is unreliable. The local cost modifiers used in its valuation were not the actual averages as calculated from the sample properties. Defendant used the average price per square foot from the local cost modifier calculation; if that value was used, then the local cost modifier would already be included. Defendant made no adjustments to the cost factors chosen. Due to the number of questions surrounding Defendant's chosen values, Defendant's evidence does not support a change to the tax roll.

/ / /

/ / /

Because Plaintiffs again failed to carry their burden of proof and Defendant's evidence again does not support a change to the tax roll, the court accepts the improvements RMV on the tax rolls for each tax year that was appealed.

## III.  CONCLUSION

After careful review of the testimony and evidence, the court concludes that Plaintiffs did not meet their burden of proof of the land or the improvements real market values.  Defendant's evidence is not sufficient for the court to make its own determination of the subject property's real market value.  In sum, the parties' evidence does not support a change in the real market tax roll values of the subject property.  The court finds that the roll values of the property identified as Account R28555, for tax years 2008-09, 2009-10, and 2010-11, are sustained.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of September 2012.


DAN ROBINSON
MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Dan Robinson on September 26, 2012. The Court filed and entered this Decision on September 26, 2012.*