IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| AARON RANKIN and SARA RANKIN, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 180080G |
| | ) | |
| v. | ) | |
| | ) | |
| MULTNOMAH COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

Plaintiffs appealed exception value added to the subject property's account by Defendant

for tax year 2017–18.  Plaintiff Aaron Rankin (Rankin) appeared at trial and testified on behalf

of Plaintiffs.  Scott Elliott and Karla Hartenberger appeared on behalf of Defendant and called

Barry Dayton (Dayton), Oregon Registered Appraiser, as a witness.  Plaintiffs' exhibits 0, 1 to 5,

5.1, 6 to 9, 9.1, 10 to 14, 16, 17, and rebuttal exhibits 19 to 23, 25, 33, 34, and 37 were admitted.

Defendant's exhibits A to C, G to H, and rebuttal exhibits J to N were admitted.

## I.  STATEMENT OF FACTS

The subject is a Southeast Portland home built in 1939 that Plaintiffs bought for $415,000

in July 2016.  (Exs 1, 22 at 1–2; Ex B at 10, 12.)  The most recent prior sale occurred in 1997,

when the subject was transferred between parties with the same last name for a consideration of

$90,000; the sale before that occurred in 1978, also between parties with the same last name.

(Exs 11, 14.)  The subject was used as a rental for many years before Plaintiffs' purchase: every

extant appraisal card from 2006 to 2016 indicates it was a rental, as well as the appraisal card

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered July 2, 2019.  The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered.  *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

from 1976; intervening appraisal cards do not record data about owner occupancy. (Ex 3 at 2–5, 9–14.)

After inspecting the subject in March 2017, Defendant determined that its records did not reflect that the subject's basement had been finished, a second bathroom had been added, and the subject's main-floor bathroom, living area, and kitchen had been remodeled. (Ex B at 12; Ex 3 at 1.) Defendant valued the work done at $49,160 and increased the subject's maximum assessed value to $159,210 on the 2017–18 tax roll.[2] (Ex 3 at 1.)

A.    *Time of Work on Basement and Second Bathroom*

Plaintiffs alleged that the basement and second bathroom had been finished decades before the year at issue. Plaintiffs submitted two plumbing inspection reports from county records, one dated in 1939, and one with a 1978 typed date and a 1982 handwritten date. (Exs 1–2.) The 1939 report reported a quantity of *1* next to items on a preprinted list of bathroom fixtures; the 1978–1982 report reported a quantity of *1N* next to items on a similar list.[3] (*Id.*) Although the handwriting on the copy in evidence was mostly illegible, the words "looked" and "final" are discernable next to the 1982 date. Rankin testified to his opinion that it meant a permit for an additional bathroom had been pulled in 1978 and finalized in 1982.

As additional evidence of the improvements' age, photographs of the subject showed that the basement and second bathroom were finished with different materials and in a different style than the main-level living area and bathroom; *e.g.*, the main-level living area had hardwood floors, while the basement had wall-to-wall carpeting. (Ex B at 30–31.) Rankin testified that the basement finish hearkened back to fashions of the 1970s.

---

[2] The subject's 2017–18 maximum assessed value would have been $134,610 without the exception value.

[3] As data on the development of the English language, it is interesting that the fixtures identified as "toilets" in the 1938 form were identified by the presumably old-fashioned term "water closets" in the 1978–1982 form.

Plaintiffs submitted into evidence all of the extant appraisal cards found in Defendant's records: those for tax years beginning 2017, 2016, 2015, 2014, 2006, 1997, 1995, 1988, 1982, 1979, and 1976. (Ex 3.) The earliest of those appraisal cards was a form completed by hand; successive cards were printouts from computer databases in a variety of formats. (*Id*.) Only the 2017 appraisal card noted the subject's second bathroom and finished basement. (*Id*. at 1.) The cards from 2016 back to 1995 each noted only one bathroom and an unfinished basement. (*Id*. at 2–10.) The 1988 card noted the existence of a basement, without specifying whether it was finished, and contained no information about bathrooms. (*Id*. at 11.) The 1982 card noted the existence of one bathroom and a basement, without specifying whether it was finished. (*Id*. at 12.) The 1979 card contained no information about either bathrooms or basement. (*Id*. at 13.) The 1976 card noted a single toilet and assigned a basement square footage, but did not specify whether the basement was finished. (*Id*. at 14.)

Rankin testified that, based on his experience analyzing databases, he concluded that Defendant had altered its computer system several times over the years to which the appraisal cards related. He further testified that data loss was common when transferring information between computerized databases.

Plaintiffs also provided evidence regarding the 1997 sale and valuation of the subject. That evidence, along with additional details from the appraisal cards, is discussed in the analysis section of this decision.

B.     *Work on Main Floor*

In the course of the work done on the subject's kitchen, it had received "cherry hardwood cabinets, solid surface quartz countertops, custom tile backsplash, and stainless appliances," as well as new flooring and a new sink. (Ex B at 10; Ex 5.) The main-floor bathroom likewise

received a new vanity, new flooring, a new sink, and a new backsplash. (Ex 5 at 1.) The evidence does not show what work, if any, was done on the living area.

As evidence of the value of the work done on the main-floor bathroom and kitchen, Plaintiffs submitted Internet listings and photographs of building components on store shelves with visible price tags. (Ex 5.) In some cases, such as the countertops, installation costs were included in pricing; in others, Plaintiffs estimated installation costs. (*Id*. at 7, 9.)

The kitchen cabinets illustrate Plaintiffs' method. Plaintiffs located two comparable products on store shelves. (Ex 5 at 1.) The first comparable was a material sample for "Livorno Cherry" cabinetry "faced in durable melamine laminate." (*Id*. at 6.) An advertisement on the sample stated "10ft. x 10ft. Kitchens starting at $2477." (*Id*.) Plaintiffs' second comparable was an online shopping cart from a home-improvement retailer filled with seven cabinets of indeterminate composition. (*Id*. at 7–8.) The total with shipping on that order was $2,779. (*Id*.) Plaintiffs averaged $2,477 and $2,779, concluding that the cost of materials for the subject's cabinetry was $2,628. (*Id*. at 1.) Plaintiffs also estimated installation costs, claiming that "[p]rofessional cabinet installers typically charge between $35–$65 [per hour]." (*Id*. at 7.) Applying one furnishing retailer's formula ("1.25 hours per cabinet"), Plaintiffs concluded that the subject's cabinets cost $260 to $480 to install; applying another retailer's formula ("$50 per cabinet") yielded an installation cost of $550. (*Id*.) Plaintiffs added $300 to the latter figure "to provide [a] conservative estimate" and concluded that the new cabinets cost $850 to install, for a "total job cost" of $3,478. (*Id*. at 1, 7.) Plaintiffs concluded that the market value of the subject's cabinets was $2,611.98—an amount equal to 75.1 percent of that job cost. (*Id*. at 1.) That percentage was drawn from the entry for "major kitchen remodel" in a 2017 Hanley Wood "cost-vs-value" study showing the average percentages of remodeling costs recouped on sale in

the "Pacific" region (including Alaska, Hawaii, Washington, Oregon, and California). (Ex 5.1 at 4, 6.)

C.    *Defendant's Valuation Evidence*

To identify the contributory value of the work done on the subject, Dayton completed two appraisal reports, one valuing the subject as it existed on the assessment date (the actual appraisal), and the other valuing it as if no work had been done on the subject as of the assessment date (the hypothetical appraisal). (Exs A, B.)

Dayton's actual appraisal identified five comparable sales, including Plaintiffs' purchase of the subject. (Ex B at 19–20.) Dayton made adjustments for time, traffic, condition, gross living area, room count, finished or unfinished basement, functional utility, heating and cooling, garages, fireplaces, and location. (*Id.*) The location adjustments were the largest, varying from negative $47,500 for a superior location—one mile northwest of the subject and closer to downtown—to positive $22,500 for inferior locations approximately 0.7 mile south of the subject. (*Id.*) Dayton concluded to a real market value of $430,000 as of the assessment date. (*Id.* at 18.) Rankin did not identify any material errors in Dayton's actual appraisal. (*See* Ex 22 at 2.)

Dayton's other appraisal adopted the following as a hypothetical condition:

"The subject property house improvement has an unfinished basement and the main level and finished attic areas are in the condition of a rental property that has not been remodeled or renovated within the last twenty years. Overall, the condition of the house, while perhaps considered average for a rental market, is below average for the market of owner occupied properties that would be considered to be market substitutions regarding location, style, size, age, and functionality. The house has only one full bath located on the main level of the house. Landscaping is very basic and, as a rental, needs maintenance."

(Ex A at 5 (emphasis deleted).) Dayton's hypothetical appraisal identified four comparable sales, all differing from those identified in the actual appraisal, and adjusted for qualities similar

to the actual-appraisal comparables. (*Id*. at 19–20.) Once again, location adjustments were the most significant, varying from negative $47,500 to positive $22,500. (*Id*.) Dayton concluded to a hypothetical real market value of $358,000 as of the assessment date. (*Id*. at 17.)

The location adjustments used in both the hypothetical and the actual appraisals were derived from identical sets of averaged sale statistics from three regions described as "around the subject," "south of subject," and "NW of subject." (Exs A at 26; B at 26.) Search parameters show that the three groups included sales of single-family homes near the assessment date built between 1920 and 1960, not including "fixers" needing repair. (*Id*.) The search parameters limited the results to homes with basements by including only properties with a "total" square footage exceeding "main + upper" square footage. (*Id*.) The average sale price and square footage within each group were close to the median, although the standard deviation was not given. (*Id*.)

Rankin identified errors in the reported distances between the subject and the comparables in the hypothetical appraisal. (Ex 23.) Comparables 2 and 3—inferior locations with positive adjustments—were reported as only half a mile south of the subject, when in fact they were just over a mile. (*Id*.) Comparable 1 was reported as 0.38 mile from the subject and not adjusted; in fact, it was 0.62 mile west. (*Id*.)

Dayton determined the value added by the main level work, the finished basement, and the second bathroom by subtracting the hypothetical appraisal value from the actual appraisal value. (Ex C.) He concluded to a range from $53,000 to $104,000, with the most likely value being $72,000. (*Id*.)

Plaintiffs request that the exception value of $49,160 be removed from the 2017–18 tax roll. Defendant requests that the exception value be increased to $72,000.

## II. ANALYSIS

The issues in this case are whether the subject incurred exception value in the 2017–18 tax year and, if so, how much. Plaintiffs presented several arguments for the negative of the first question, which the court addresses in turn. Finding that Plaintiffs did not carry their burden of proof, the court then considers Defendant's request that exception value be increased.

A. *Applicable Law*

1. *Maximum Assessed Value and Exception Value*

The Oregon Constitution limits yearly increases in *ad valorem* property taxes attributable to increases in property's real market value. Or Const, Art XI, § 11 (implemented by statute at ORS 308.142 to 308.166).[4] It does that through the concepts of "assessed value" and "maximum assessed value." Or Const, Art XI, §§ 11(1)(b), (f); *see also* ORS 308.146(2). The property tax rate is applied a property's assessed value, which is defined as the lesser of its real market value and its maximum assessed value. *Id*.

Generally, a property's maximum assessed value increases no more than three percent each tax year. Or Const, Art XI, §§ 11(1)(a), (b); ORS 308.146(1). However, there are six types of occurrences—known in legal parlance as "exception events"—that require a special determination of maximum assessed value, potentially increasing maximum assessed value by more than three percent in a given year. Or Const, Art XI, § 11(1)(c); ORS 308.146(3). Value attributable to an exception event is known as "exception value." When property incurs exception value, a share of that value is added to its maximum assessed value proportionate to average maximum assessed value over average real market value. *See*, *e.g.*, ORS 308.153(1)(b).

///

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2015.

In this case, Defendant found the subject incurred exception value because a portion of it was "new property or new improvements to property[,]" the first of the six enumerated exception events. Or Const, Art. XI, § 11(1)(c)(A); ORS 308.146(3)(a). Specifically, Defendant identified the finishing of the basement, the addition of the second bathroom, and the work done on the main-level kitchen and living area as components yielding exception value.

2. *New Property or New Improvements to Property*

The meaning of "new property or new improvements to property" has recently been the subject of an opinion by the Oregon Supreme Court, issued after trial was held in this case. *DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, 285, 434 P3d 379 (2019) (abrogating *Douglas County Assessor v. Crawford*, 21 OTR 6 (2012)). Under the holding of this court in *Crawford*, property existing more than a year before the assessment date was not considered "new property or new improvements." Thus, assessors could not add older property to a tax account for the first time without prior notice, but were, instead, required to give advance notice under statutory procedures for adding "omitted property." *See* ORS 311.205 to 311.235.[5] That is no longer always the case; for a property to be "new property or new improvements," it now suffices that it has not been previously included in the assessment of the land or improvements. *DISH Network*, 364 Or at 285.

The constitutional holding of *DISH Network* was anticipated by the legislature in a 2015 amendment to the statutory definition of "new property." As amended, ORS 308.153(3) states:

"(a) For purposes of this section, property shall be considered new property, or new improvements to property, for a tax year if the property:

/ / /

---

[5] Addition of omitted property to the roll for the first time is another exception event. Or Const, Art XI, § 11(1)(c)(D); ORS 308.146(3)(d).

"(A) Constituted an integral part of the land or improvements on the assessment date or the date of a site inspection by the assessor for appraisal purposes for any prior tax year;

"(B) Has been continuously in existence since the prior tax year; and

"(C) Was not included in the assessment of the land or improvements for any prior tax year.

"(b) The following is evidence that the property was not included in the assessment of the land or improvements for a prior tax year:

"(A) There is no express reference to the property in the records of the assessor; and

"(B) The assessor's valuation of the land or improvements of which the property is an integral part increases as a result of inclusion of the property in the assessment."

Consistent with *DISH Network*, the above definition of new property includes property existing in "any prior tax year" but not previously assessed.

3.    *Burden of Proof*

A party seeking affirmative relief in this court must bear the burden of proof, with the burden of going forward with the evidence shifting as in other civil litigation. *See* ORS 305.427. Here, it is Plaintiffs' burden to prove the subject incurred no exception value at all, and Defendant's burden to prove any exception value above the amount already on the tax roll.

Plaintiffs cite with approval the case of *Sullivan v. Multnomah County Assessor*, TC–MD 060240B, 2007 WL 900756 (Or Tax M Div Mar 22, 2007) (Tanner, P.M.). In *Sullivan*, the taxpayers appealed the addition of exception value for a bathroom and kitchen remodel, successfully proving that the bathroom was not a new improvement. The court noted that the assessor "did not separate the real market value of the kitchen remodel from the total amount added to the tax roll" and ordered the removal of all exception value on the ground that the undifferentiated total did not meet the statutory requirements.

*Sullivan* may be understood as reflecting a shift in the burden of going forward with the evidence that occurred after the taxpayers proved some portion of the exception value had been added in error. *See* ORS 305.427. After it was shown that the bathroom was not a new improvement, it became incumbent on the assessor to present evidence on which the court could uphold the portion of the exception value attributable to the kitchen remodel. Lacking such evidence, the court was unable to determine exception value and disallowed the entire amount. *See* ORS 305.412 (stating court's jurisdiction to determine value "on the basis of the evidence").

B.      *Plaintiffs' Arguments*

Plaintiffs raised several arguments at trial in varying levels of detail. The court will address each of them in turn.

1.      *Five-Year Limit*

Plaintiffs allege that Defendant's addition of value for basement work and a second bathroom exceeded a statutory five-year limit for inclusion of such property because those improvements were constructed decades before.

Although the evidence is not conclusive, it is more likely that work was completed on the basement and second bathroom in 1982 than that it was done at the same time as the main-level work. The plumbing report is more significant than the basement décor in assigning a date, but the latter at least tends to show the basement was not finished contemporaneously with the main level.

However, the court is unaware of a statutory limit on the age of property that may be added to a current year's tax roll. Assessors' authority to add omitted property extends to "any year or years not exceeding five years prior to the last certified roll[.]" ORS 311.216(1). That

/ / /

five-year limitation pertains to the number of prior years' back taxes that may be assessed, not to the age of the omitted property so added.

The omitted property statutes are not applicable in the present case because Defendant added the finished basement and second bathroom as "new property" rather than omitted property. In so doing, Defendant added value only to the current year's roll and did not assess back taxes. No five-year limitation was exceeded.

2.     *Property Included in Prior Year's Assessment*

Plaintiffs allege that the finished basement and the second bathroom were not "new property" because they had been included in prior years' assessments. *See* ORS 308.153(3)(a)(C). ORS 308.153(3)(b) provides guidance on evidence indicating whether property has previously been included in an assessment:

> "(b) The following is evidence that the property was not included in the assessment of the land or improvements for a prior tax year:
>
>> "(A) There is no express reference to the property in the records of the assessor; and
>>
>> "(B) The assessor's valuation of the land or improvements of which the property is an integral part increases as a result of inclusion of the property in the assessment."

The two conditions laid out in ORS 308.153(3)(b) are not conclusive; by the statute's own terms they are merely "evidence." Nevertheless, the court is bound to decide cases based on evidence. To prevail in the face of silent assessor's records and an increased assessment, a taxpayer would need to provide countervailing evidence that the property in question had formerly been assessed.

In this case, Rankin credibly explained how the record of a prior assessment of the subject's finished basement and second bathroom might have been lost as Defendant transferred

its records from paper and then through various software-based records-retention systems. Defendant's 1979 appraisal card—the first stored in a computer system—dropped virtually all of the details about the subject's improvements contained in its paper appraisal card from 1976. (Ex 3 at 13–14.) Defendant appears to have changed its software during the years between each of the next several appraisal cards, with each card containing different fields for information. Thus, the 1982 appraisal card states the subject had one bathroom, but the 1988 appraisal card did not report on bathrooms at all. (Ex 3 at 11–12.) The subject's basement was first expressly described as unfinished in the 1995 appraisal card. (Ex 3 at 10.)

Although Plaintiffs showed grounds for questioning the reliability of the data contained in the assessor's records, their burden may be met only with evidence that the improvements in question were actually included in a prior assessment. Plaintiffs argue that such evidence can be found in documents available from two years: 1976 and 1997.

a.　1976

The subject's 1976 appraisal card contains numerous details about improvements and a line-by-line itemization of factors contributing to their assessed value. (Ex 3 at 14.) The subject is assigned a "base factor" of $17,500 on the line at the top noting its class ("4D"), number of stories ("1 + Att"), and square footage ("806"). The line immediately below adds $4,300 to that base factor, noting the subject has a concrete slab foundation and an 806-square-foot basement. Subsequent lines add value for trim, fireplaces, a finished 300-square-foot attic, and setting, and subtract $550 for a single bathroom.

Plaintiffs argue that the addition of value for basement square footage shows the basement was finished in 1976. However, the available evidence does not go that far. Assuming that at least some portion of the $4,300 was added for the basement and not for the concrete

foundation, Plaintiffs' argument presumes either that the assessor would not have noted unfinished square footage or that an unfinished basement would have contributed less value to the subject than was assigned. No evidence before the court supports either presumption. Without an express reference to a finished basement, it is just as likely that the additional value was added for an unfinished basement. The fact that "Unf." and "Fin." were not preprinted as checkable items in the basement section of the form—although they were in the attic section—may indicate the assessor at that time did not consider whether a basement was finished when assigning value. The 1976 appraisal card is ambiguous.

b.    1997

Plaintiffs' evidence from 1997 revolves around the sale of the subject in that year for $90,000. (Ex 14.) Rankin generated a list of 1997 comparable sales of similarly-sized, older homes in the subject's zip code "from public records, primarily [Defendant]." (Ex 17 at 16.) Rankin derived a price per square foot for each comparable by dividing the figure from the "total sq ft" column by the sales price. He concluded that homes similar to the subject sold for a minimum of $15 per square foot, a maximum of $62 per square foot, and an average of $46 per square foot in 1997. Rankin then considered the subject's square footage both with and without its basement square footage, finding that the subject's 1997 sale price was $47 per square foot with the basement, but $82 per square foot without it. Rankin reasoned that if the subject's basement had been unfinished in 1997, its total square footage would have been reduced such that its sale price per square foot would have far exceeded all comparables. On the other hand, its sales price was squarely within the range if its total square footage included a basement.

Rankin's reasoning depends on the square footage of an unfinished basement being excluded from total square footage. That fact is not in evidence. The parameters provided by

Defendant to support Dayton's location adjustments indicate that basement square footage is included in total square footage in county records, but not whether that square footage was finished. Because Rankin drew on county records for his 1997 comparables, it is not clear whether unfinished basements are excluded from the square footages of those comparable properties.

Rankin also noted that the subject's 1997 sale price was relatively close to the real market values assigned by Defendant at that time: $95,300 in 1996 and $103,900 in 1997. (Ex 10.) From that fact, he concluded that the subject's assessment actually included the market value of all its improvements, regardless of errors in the appraisal cards.

The evidence is insufficient to support Rankin's argument. The subject's 1996 and 1997 tax roll values are not entitled to any presumption of correctness. *J.R. Widmer, Inc. v. Dept. of Rev.*, 261 Or 371, 377, 494 P2d 854 (1972). The market evidence is tenuous—the 1997 comparables are unverified, and their sales prices are unadjusted. Those prices vary widely, with maximum sale prices per square foot more than quadruple the minimum. What is more, there is evidence that the subject's 1997 sale was an intrafamily transfer and therefore not arm's-length: the transaction took place between parties with the same last name, just as the prior sale in 1978 had. The sale price of such a transfer cannot be relied on to have included the value of improvements unknown to the assessor; related parties may have agreed on a sale price near the assessed value, thereby carrying forward any error on the tax roll.

3.      *Code Violations*

As an alternative argument, Plaintiffs allege the basement windows of the subject do not meet current City of Portland height requirements for egress in living spaces. The conclusion

/ / /

drawn is that the code violations leave the subject's basement unfinished and therefore not susceptible to being added as new property.

However, nowhere in the statutes is the addition of new property made contingent on a category such as "finished" or "unfinished." The relevant definition is found at ORS 308.149(6), and states that new property means "changes in the value of property" resulting from, *inter alia*, "[n]ew construction, reconstruction, major additions, remodeling, renovation or rehabilitation of property[.]" ORS 308.149(6)(a)(A). Improvements out of compliance with building codes may still constitute additions, remodeling, or renovation. Whether they change the value of property is determined by the market rather than the building codes. In this case, Rankin testified that Plaintiffs did not consider the code violations at all when they purchased the subject.

4.      *General Ongoing Maintenance and Repair*

Turning from the basement and second bathroom, Plaintiffs allege that the work done on the subject's main level was general ongoing maintenance and repair (GOMAR) or minor construction, rather than remodeling. Those two categories are specifically excluded from the definition of new property found in ORS 308.149(6), which states:

> "(a) 'New property or new improvements' means changes in the value of property as the result of:
>
> "(A) New construction, reconstruction, major additions, remodeling, renovation or rehabilitation of property[.]
>
> "* * * * *
>
> "(b) 'New property or new improvements' does not include changes in the value of the property as the result of:
>
> "(A) General ongoing maintenance and repair; or
>
> "(B) Minor construction."

/ / /

Terms enumerated in the statute are defined by OAR 150-308-0130, which states:

"(1) For purposes of ORS 308.149:

"* * * * *

"(d) 'Remodeling' means a type of renovation that changes the basic plan, form or style of the property.

"(e) 'Renovation' means the process by which older structures or historic buildings are modernized, remodeled or restored.

"(f) 'Rehabilitation' means to restore to a former condition without changing the basic plan, form or style of the structure.

"(2)(a) For purposes of ORS 308.149 'general ongoing maintenance and repair' means activity that:

"(A) Preserves the condition of existing improvements without significantly changing design or materials and achieves an average useful life that is typical of the type and quality so the property continues to perform and function efficiently;

"(B) Does not create new structures, additions to existing real property improvements or replacement of real or personal property machinery and equipment;

"(C) Does not affect a sufficient portion of the improvements to qualify as new construction, reconstruction, major additions, remodeling, renovation or rehabilitation; and

"(D) For income producing properties is part of a regularly scheduled maintenance program.

"(b) Regardless of cost, the value of general ongoing maintenance and repairs may not be included as additions for the calculation of maximum assessed value."

This court applied the above definitions in *Strom v. Dept. of Rev.*, 15 OTR 309 (Or Tax 2001). The subject property in *Strom* was an older home that had "deteriorated in condition and appearance" over the course of many years' use as a rental property. *Id*. at 310. The taxpayer had performed extensive remodeling and renovation work on that property. The court

specifically found that installing new kitchen cabinets and counters "clearly" qualified as remodeling, whereas replacing kitchen and bath fixtures constituted renovation. *Id*. at 313. The court rejected the argument that the work done was GOMAR because "[m]uch of the existing materials were removed, discarded, and replaced with new materials." *Id*.

Not all replacements of counters and cabinets are remodeling, as shown by the Department of Revenue's May 2018 *Maximum Assessed Value Manual*. (Ex 8.) That publication lists the replacing of worn-out kitchen countertops among its examples of GOMAR, and further states that replacing 10-year-old kitchen cabinets is only "usually" more than just maintaining property. (*Id*. at 25.) In general, "[a] change to the modern equivalent of original materials for the same class of construction is allowed, such as the replacement of old aluminum frame windows with new vinyl windows that would be used in the same class of building today." (*Id*.)

On the evidence before the court, it is unclear whether the new cabinets and counters constituted remodeling or whether they merely replaced worn-out equivalents. Although Defendant highlights the fact that the new counters were made of quartz and the cabinets made of hardwood, it is unknown whether quartz counters or hardwood cabinets are now unusual in a class 4 home such as the subject.

If the main-level work was not remodeling, however, it appears likely that it was rehabilitation. Like the property in *Strom*, the subject had been a rental for many years—Plaintiffs allege it was rented out for more than 40 years. Under such circumstances, it is reasonable to suppose that its condition had deteriorated from that of an owner-occupied home, as Defendant's appraiser did in his hypothetical appraisal. At trial, Rankin admitted that the subject had not been maintained for at least 20 years before 2016 and that it had suffered from

deferred maintenance. At the time of Defendant's physical appraisal in 2006, an overall condition of "average" was placed on the subject's appraisal card. (Ex 3 at 5.) In 2017, Defendant found the subject's overall condition had improved from "average" to "A+." (*Id*. at 1.) Although Plaintiffs might not agree with that condition adjustment, Rankin admitted at trial that the subject was a nice house. The photographs confirm that statement; the subject's condition exceeds that of a rental with deferred maintenance.

On balance, the evidence tends to show that the work done on the subject's main level was either remodeling or rehabilitation, and therefore did not qualify as GOMAR.

5.      *Minor Construction*

Plaintiffs argue the kitchen and bathroom work was also excluded from the definition of new property as "minor construction." *See* ORS 308.149(6)(b)(B). " 'Minor construction' means additions of real property improvements, the real market value of which does not exceed $10,000 in any assessment year or $25,000 for cumulative additions made over five assessment years." ORS 308.149(5). The test for minor construction "is not the cost of the work but whether the work increases the [real market value] $10,000 or more in any assessment year or $25,000 for cumulative additions made over five assessment years." *Strom*, 15 OTR at 313–14.

Plaintiffs' evidence of the total value of the main-level work is unconvincing on its own terms. Their estimates of material costs did not clearly align with the actual materials used in the subject kitchen. For example, Plaintiffs provided evidence of the cost of laminate-faced cabinets, but did not rebut Defendant's assertion that the subject's cabinets were hardwood. Likewise, Plaintiffs accepted an advertised "starting" price for cabinets to fit a 10-foot-by-10-foot kitchen as comparable to the subject's installed cabinets, but did not show the size of the subject's kitchen or what options could affect that "starting" price. Plaintiffs did not disclose

how they derived their estimate of hourly rates for cabinet installation, nor were their two divergent estimation methods supported with market data.

More fundamentally, however, Plaintiffs' method errs in attempting to value the kitchen and bathroom improvements from the market price of their component parts, without regard to those parts being integrated into the total unit. Real market value must be determined "by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). OAR 150-308-0240(2)(b) forbids the kind of piece-by-piece valuation Plaintiffs attempt, and for good reason. Such a valuation ignores the "assemblage" value, which is the value reflecting "the cost of assemblage and the risk reduction feature that successful assemblage adds." *Norpac Foods, Inc. v. Dept. of Rev.*, 18 OTR 41, 50 (2004). The value of a whole may be greater or less than the sum of the values of its parts.

C.       *Defendant's Evidence of Increased Exception Value*

Although Defendant placed an exception value of $49,160 on the tax roll, the value indicated by Dayton's actual appraisal was $72,000 more than the value indicated by his hypothetical appraisal. On that basis, Defendant requests that the subject's exception value be increased to $72,000. Defendant must bear the burden of proof on that issue. *See* ORS 305.427.

Dayton's appraisals are the only competent evidence of value before the court. They are not free from criticism, and Plaintiffs effectively criticized some of the adjustments made. Even after considering those criticisms, however, it appears likely that Defendant will have shown a significant value difference between the subject with and without the new property added. Before evaluating that difference, however, it is appropriate to ask whether that difference is the measure of exception value in this case.

/ / /

This court has long held that the calculation of exception value must exclude changes due to external factors such as "inflation, market demand, and construction codes." *Magno v. Dept. of Rev.*, 19 OTR 51, 63 (Or Tax 2006) (citing *Hoxie v. Dept. of Rev.*, 15 OTR 322, 326 (Or Tax 2001)). That requirement flows directly from the language of ORS 308.149(6)(a) defining new property as changes in value "as a result of" improvements. *See Hoxie*, 15 OTR at 326. Changes in value due to inflation and market activity over time are not "the result of" improvements added as new property.[6]

In the present case, the balance of the evidence shows that the second bathroom and basement were finished many years before the assessment date. Plaintiffs provided a plumbing permit that is consistent with the second bathroom having been completed over 30 years before it was added to the subject; it is possible that the basement was also finished at that time.

Dayton's hypothetical appraisal assumed the subject had one bathroom and an unfinished basement on the assessment date. If the second bathroom and basement were actually finished 30 years before, then their portion of the exception value so concluded incorporated 30 years' worth of inflation and market activity. That inflation and market activity must be excluded to determine how much value was the result of the actual work done. *See Hoxie*, 15 OTR at 326. Dayton's appraisals do not provide a means to exclude those factors; it is doubtful that any credible adjustment could be made over such an extended period. Because the requested $72,000 exception value includes some unquantified portion attributable to inflation and market

/ / /

---

[6] When *Hoxie* and *Magno* were decided, the court treated the concept of "new property" as including a temporal component, such that improvements made more than a year or two before the assessment date "would not be considered 'new improvements' under ORS 308.153." *Hoxie*, 15 OTR at 327; *see also Magno*, 19 OTR at 66. Although *DISH Network* has now abrogated that interpretation, its holding does not address the requirement that exception value for new property be "the result of" the improvements added.

demand, the entire number is unreliable.  *See Sullivan v. Multnomah County Assessor*, TC–MD 060240B, 2007 WL 900756 (Or Tax M Div Mar 22, 2007).

## III.  CONCLUSION

The evidence failed to show that improvements could not be added to the subject as "new property" pursuant to the holding of *DISH Network*.  Likewise, no increase to the exception value is warranted because the evidence does not show that inflation and market demand were excluded from the valuation provided.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of July, 2019.


_____
POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on July 22, 2019.*